Michelle **BAZZETTA, Stacy Barker, Toni Bunton, Debra King, Shante Allen, Adrienne Bronaugh, Alesia Butler, Tamara Prude, Susan Fair, Valerie Bunton and Arturo Zavala, through his Next Friend Valerie Bunton, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Kenneth McGINNIS, Director of Michigan Department of Corrections, Dan Bolden, Deputy Director of the Correctional Facilities, Michigan Department of Corrections, Marjorie VanOchten, Administrator of the Office of Policy and Hearings of the Michigan Department of Corrections, Michigan Department of Corrections, Defendants.**

No. 95–CV–73540–DT.

United States District Court, E.D. Michigan, Southern Division.

April 19, 2001.

Michael J. Barnhart, Detroit, MI, Deborah A. LaBelle, Ann Arbor, MI, Patricia A. Streeter, Detroit, MI, for Plaintiffs.

Lisa C. Ward, Kevin M. Thom, Barbara A. Schmidt, George N. Stevenson, Michigan Dept. of Atty. General, Lansing, MI, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDMUNDS, District Judge.

### INTRODUCTION

Plaintiffs, inmates of the Michigan Department of Correction and their prospective visitors, brought this suit against the Director of the Department challenging various restrictions on visitation. Specifically, Plaintiffs challenge restrictions which 1) prohibit visits by siblings, nieces and nephews who are under eighteen years old; 2) prohibit visits by children whose prisoner parents have had their parental rights terminated (even when that termination is voluntary); 3) prohibit visits from former prisoners who are not immediate family; 4) require visiting children to be brought by a parent or legal guardian; and 5) impose a permanent ban on visitation for any prisoner who has been found guilty of two substance abuse misconducts.

With respect to claims 1 through 4, this Court issued two previous decisions, affirmed by the Sixth Circuit Court of Appeals, upholding the restrictions in the context of contact visits. Thus, the only remaining issue on claims 1 through 4 is whether the restrictions are constitutional in the context of non-contact visits. Claim 5

was not ripe at the time of the earlier decisions and is addressed here for the first time.

In support of their claims, Plaintiffs presented testimony from a number of MDOC officials, present and former inmates, and from several experts and family members.

Marjorie VanOchten was the MDOC administrator of the Office of Policy and Hearings until January 2000; she drafted the rules at issue in this case. Although she had been an executive level official of the MDOC for over twenty years, she was critical of many aspects of the visitation restrictions, including the exclusion of minor siblings, nieces and nephews, the requirement that a minor child be accompanied by a parent or legal guardian, and the permanent ban on visitation following two substance abuse misconducts. She testified about her own concerns, concerns raised by the public, and about the procedural history and problems related to the restrictions.

Suellen Scarnecchia, Associate Dean for Clinical Affairs at the University of Michigan Law School, testified as an expert on the subject of incarcerated parents. She was particularly critical of the rule requiring a minor child to be accompanied by a parent or legal guardian and the rule precluding visits by a child whose prisoner/parent had terminated parental rights.

Dan Bolden, the Deputy Director of the MDOC since 1984, was called by Plaintiffs for cross-examination. He testified about the penological objectives of the rules and procedures used by the MDOC to draft the restrictions, and the reasons the Department had for deciding on particular exclusions and sanctions. He was cross-examined extensively on the justification for excluding minor siblings, nieces and nephews, on the efficacy of using non-contact visitation to address his various concerns, and on the procedural problems (inconsis-tent enforcement, lack of notice and standards) related to the permanent ban on visitation following two substance abuse misconducts.

Phillip Creekmore, called by Plaintiffs as one of their experts, was asked to compile data supplied by the MDOC and summarize it in exhibit form. See Pls.' Exs. 41–48, 50–51. The statistical data compiled by Creekmore primarily addressed the issues of volume (including early termination of visits), misconducts related to visits, and the inconsistences in the enforcement of the permanent ban.

Barry Mintzes is a psychologist who worked for the MDOC from 1970 to 1982, including positions as administrative assistant to the director, and warden of the facilities at Kinross and Jackson. In criticizing the Department's permanent ban on visitation following two substance abuse misconducts, Dr. Mintzes testified about the importance of visitation to prison management, as well as for the rehabilitation of the prisoner. He also testified that the use of visitation standards and non-contact booths would have been more than adequate to meet the penological objectives stated by the Department, without excluding whole categories of visitors.

Joan Yukins, the warden of the women's facility in Plymouth (Scott), was called as an adverse witness. She testified about the impact of the restrictions concerning minor children, particularly as they affect women prisoners, and she was also cross-examined about the procedural difficulties she and the inmates encountered in connection with the permanent ban (inconsistent enforcement, inadequate or confusing notice, absence of criteria for restoration of privileges, collateral consequences).

Dr. Terry Kupers, a psychiatrist with extensive background in correctional issues, was one of Plaintiffs' key witnesses.

Dr. Kupers testified about the importance of visitation to the mental health, stability, and rehabilitation of the prisoner. He commented on the impact of incarceration on family bonds, and the additional impact caused when visitation is restricted; he testified to the inadequacy of telephone calls and letters as alternatives, particularly where children are involved. Although Dr. Kupers touched on a number of topics related to the visitation restrictions, the primary thrust of his testimony was the social and psychological damage caused by the permanent ban on visitation, the counterproductive effect on long term drug abuse and the prisoner's reintegration with society, the destruction of marital and family relationships, and the cruelty involved in the Department's denial of a basic human need. He also testified that Michigan's visitation restrictions are an excessive response to problems with much better alternative solutions, and that Michigan's use of visitation sanctions in this manner is unique among prison management regulations.

Plaintiffs also called a number of prisoners, former prisoners, and family members who testified about the impact of the various restrictions on their family relationships and mental health.

Defendants did not challenge or contradict any of Plaintiffs' experts with experts of their own. Instead they relied on the testimony of a number of MDOC witnesses to support the penological objectives of the rules and to otherwise counter Plaintiffs' claims.

Kenneth McGinnis, Director of the MDOC from 1991 to January 1999, testified concerning the penological objective of maintaining security with the increasing volume of visitors. He testified to security concerns involving minor children, and he discussed the impact of the visitation standards introduced in 1995. With respect to the permanent ban on visitation, Mr. McGinnis testified about his desire for a zero tolerance policy to get at the problem of drug abuse within the system, which he considered to be ongoing and complex. He was cross examined about the justification for excluding minor siblings, the procedural inconsistencies with the permanent ban, the alternative of using non-contact visitation, and the criticism of the permanent ban as being overly harsh and punitive.

Pat Caruso, an MDOC regional administrator and former warden, testified about the difficulties of managing the visiting room in a level 5 facility. She testified that the permanent visitation ban was a powerful management tool, particularly because level 5 and 6 prisoners are already restricted to non-contact visits.

Pamela Withrow, a warden at various MDOC facilities since 1983, supported the decision to exclude as many minor children as possible from visitation, including minor siblings. She also testified that non-contact visitation does not solve the security concerns addressed by the rules, because sexual misconduct can occur even in non-contact booths.

Kurt Jones, who has been with the MDOC since 1977, has been the warden at Carson City since 1996. He testified that the 1995 changes have had a positive impact on the visitation process, and that he supports the permanent visitation restriction because he believes it has helped reduce substance abuse misconduct.

Sally Langley, the warden at Crane (women's) facility, also testified in support of the permanent visitation restriction as an effective management tool.

Finally, Julie Southwick, administrative assistant to Dan Bolden, testified concerning the availability of non-contact booths, the policies of several other states concern-

ing visiting restrictions, and the procedure for seeking restoration of visiting privileges.

In addition to the witnesses called, both parties submitted exhibits and affidavits, including a selection from the random sample (20%) of all prisoners placed on permanent visitation restriction since 1995.[1]

These matters were tried to the bench in the fall of 2000; the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. Importance of Visits

Visits from family and other loved ones are extremely important in the life of most prisoners. A broad consensus, supported by decades of research, affirms that visits promote rehabilitation, reduce behavior problems, and significantly increase a prisoner's chance for success on parole.

Visits are also important to maintaining prisoners' mental health. Because a high percentage of prisoners suffer from significant substance abuse, mental illness, and life-threatening illnesses, they are particularly vulnerable to the impact of stress. Visits help ease the impact of these conditions, particularly for those suffering from depression or dual diagnosis (mental illness combined with substance abuse). Letters and telephone calls are inadequate as an exclusive means of maintaining family bonds over a period of years.[2]

1. Plaintiffs requested and Defendants objected to the production of the files of all prisoners placed on permanent restriction since 1995. The Court ordered that Defendants produce a random sample of 20% of those files, which amounted to approximately 250 files. A portion of these files were introduced as Plaintiffs' Exhibit 40 Order, 6/22/200; Tr. 3, p. 135.

2. Dr. Terry Kupers, a psychiatrist with extensive experience in prison issues affecting mental health, testified that,

[s]ocial relations are very important to human beings in general in terms of maintaining ... their mental health, their self esteem, their connection with reality, and we have studies that show that isolation, whether it's cabin fever, exploration of the arctic, or isolation in captivity, causes very severe mental illnesses, including psychosis, including suicide.

So disconnection from people who have a meaningful, caring relation with one causes one's mental health to plummet.

Tr. 6, pp. 130–31.

With respect to the adequacy of telephone calls and letters as alternatives to visits, Dr. Kupers stated:

I mentioned that 40–some percent of prisoners are illiterate. I would put it more like 60 or 80 percent cannot compose a decent letter. Literacy, functional literacy is defined as being able to write a check or do a transaction at a sales counter, so to write a letter that expresses anything very deeply, I'd say 60 to 80 percent of prisoners are incapable of doing that, and their family, for instance, young children, are incapable of doing that.

So the letter writing is not, is not as good all together, but then, in addition, letter writing is controlled in prison, that is, that mail is often read, or there's the realistic expectation that the mail will be read, so you have to censor what you say. There are long delays in getting mail in and out depending on the situation within the correctional facility.

Phone calls are even more problematic. If you or I pick up the phone and call someone, a relative, we have free and unfettered oral contact. In prison that's not the case. It's very difficult to find time in many prison situations to make the call. The call is expensive, and many of the families, as I said, these are low income people and low income families, can't afford phone calls. They're approximately three to five times as expensive when made from a prison, and the phone calls usually have to be initiated from the prison and made collect. There are many families that either move, they lose their phone because they can't afford the bill or whatever, so the phone, actual contact doesn't occur, or if it occurs, every few minutes there's a tape that comes on

Because of the importance of visits to the prisoner, the system, and the larger community, the American Correctional Association Standards state that visits should be limited only by institutional schedule, space, and personnel constraint, or when there are substantial reasons to justify limitations; that prisoners should be permitted to visit with people of their choice unless there is a clear and convincing threat to safety and security; and that even prisoners in segregation should have opportunities for visitation unless there are substantial reasons for withholding it. Defendants' visiting policy used to expressly state that visits are important to rehabilitation and post-release adjustment, and should be encouraged.[3]

## II.  *Imposition of Restrictions*

The evolution of the challenged restrictions goes back to the early 1990's. Michigan's prison population increased substantially from 1990 to 1994, and has continued to increase through 2000. Many facilities house inmate populations beyond their intended capacities; double bunking became commonplace by the early 1990's. *See* Tr. 1, pp. 72–73. In none of these facilities, however, was visiting space expanded to accommodate the additional prisoners. *See* Tr. 1, p. 73.

By 1994, some management personnel at MDOC perceived problems related to the increased number of visitors and visits at the facilities. These problems included the necessity to terminate some visits early,[4] the difficulty of detecting drug trafficking and smuggling related to visits, and the difficulty of supervising young children who became bored or restless during long hours in the visiting room or waiting room.

As an initial response to these problems, in April 1995, the MDOC promulgated regulations which established certain restrictions on visitation, department-wide visiting standards to be applied uniformly at

that says you are talking to an inmate at a state institution, and that's very disruptive to any kind of meaningful communication. There's also, depending on the security level, usually time limits and halts to the phone call.
Tr. 6, pp. 143–44.

**3.**  As explained by Dr. Kupers:

Separation from family is part of the function of incarceration. It's part of the function of quarantining people. Their contact with family and loved ones and friends and community is severed. The idea, then, is to restore some unity and some continuity of close bonds by having visitation. That's why, in almost every arena, visitation is required, whether it's the Department of Corrections in Michigan, and their policies state that.

Many of the states mention in their policies that contact with family gives a prisoner a better chance of succeeding after they're released, and therefore the department wants to foster it. The United Nations mentions that, the United States general accounting office mentions that in their

reports on incarceration. It's crucial that a prisoner have contact with loved ones in order to maintain their stability while they're in prison, to do their program without falling apart, and then to prepare and then succeed at post release, becoming part of the community again.
Tr. 6, pp. 133–34.

**4.**  Actual termination statistics do not support the Department's perception of the problem as being widespread. *See* Pls.' Ex. 45 (showing the percent of visits terminated for lack of space on a yearly basis from 1994/95 through 1997/98, shows that the total percent of terminations prior to the challenged restrictions was 0.71%). The only facilities where terminations exceeded 2% were SMT Parnall (2.44%), STF Mid–Mich Temp (2.79%), and ARF Gus Harrison (2.08%). Thirty-one of the Department's thirty-nine facilities which were open in 1994/95 had fewer than 1% of visits terminated; ten facilities had zero terminations, even prior to the imposition of the first wave of restrictions. To the extent that this problem existed, it appears to have been limited to a few of the downstate facilities.

each facility. *See* Pls.' Ex. 4 ("visiting standards"). These standards, adopted the following month, limited the number of visits allowed to prisoners each month, depending on their security classification, restricted the hours of visitation and the number of weekend visits, and also restricted the number of persons who could visit a prisoner at one time.[5] Facilities which housed prisoners in more than one security level were required to split their visiting hours between those groups of prisoners. These standards are not challenged by Plaintiffs.

Later in 1995, the Department issued amendments to administrative rules for prisoner visiting privileges. The 1995 rules that are at issue in this case set forth the following criteria, among others: [Mich. Admin. Code Rule 791.6607 through 791.6614]

Define what persons are in a prisoner's immediate family; [For purposes of this provision, siblings are defined as immediate family]. *See* § 791.6609(9).

Limit the number of visitors for a prisoner; [Prisoners are limited to an approved list of ten visitors, not including immediate family]; *see id.* § 791.6609(2).

Require visitors and immediate family members to be on a prisoner's list of approved visitors; [Pre-screening of all visitors.] *see id.* § 791.6609(2).

Restrict prisoner's access to minors, in that minors under the age of 18 are not permitted to visit unless they are the child, stepchild, or grandchild of the prisoner and accompanied by an adult immediate family member or a legal guardian. Additionally, a child is not permitted to visit if the parental rights of the prisoner have been terminated; *see id.* § 791.6609(2)(b), (5), (6).

Prohibit former prisoners from visiting unless they are the immediate family of a prisoner or unless prior approval for the visit is obtained from the warden of the institution where the visit will occur; *see id.* § 791.6609(7) and

Permanently ban all visitation (other than attorneys or clergy) for prisoners with two or more major misconduct charges of substance abuse. *See id.* § 791.6609(11).[6]

*See* Pls.' Ex. 1.

MDOC Deputy Director Dan Bolden testified that one goal of the Department in enacting visiting restrictions was to reduce the volume of visits and visitors by

---

**5.** Prior to their adoption, the consideration of the department-wide visiting standards provoked a number of comments from wardens and other management personnel. Warden Luella Burke, of the Saginaw Correctional Facility, wrote to observe that prisoners at multi-level facilities such as Saginaw would be penalized by the mandatory separation of visiting hours; Warden Robert LeCureux of Hiawatha/Kinross wrote to suggest that visitors to facilities in the Upper Peninsula could rarely visit midweek because of the distance, making the limit on weekend visits unnecessarily harsh and restrictive; Warden David Trippet of the Thumb Correctional Facility wrote to suggest some incentives for prisoner behavior which would increase their visiting privileges under the new standards. Wardens Yukens, Burt and Holland requested vari-

ances which were granted on a temporary basis "pending additional revisions to the agency-wide standards which are scheduled to become effective May 15, 1995." In each case, the request was denied by the Director or one of his deputies. *See* Pls.' Exs. 9, 10, 11, 12, 14, and 15.

**6.** Substance abuse misconducts include not only use or possession of narcotic drugs such as marijuana, heroin and cocaine, but also use or possession of alcohol or any intoxicant, unauthorized use or possession of prescribed or restricted medication, failure or refusal to submit to drug testing (urine tests or drug patches), and possession of narcotics paraphernalia. *See* Pls.' Ex. 2, MDOC Policy Directive 3.03.105, p. 5.

10–15%. *See* Tr. 3, p. 83. As a result of the restrictions imposed by the visiting standards adopted in May 1995, the volume of visits and visitors decreased substantially over the next several months. Plaintiffs' witness Philip Creekmore, who compiled summaries of visiting statistics from MDOC's computerized visitor tracking system and other MDOC documents, testified that in April 1995, most facilities were below two visits per inmate per month, and that indeed the majority were below one visit per inmate per month. With respect to the fifteen facilities which had the highest volume of visits, the April 1995 average was 2.407 visits per inmate; that ratio dropped in August/September 1995 to 1.5 visits per inmate. The ratio decreased further in October 1995, down to approximately 50% of the numbers prior to the May 1995 rule change. Thus, within six months, the visiting restrictions exceeded, by three to five times, the original goal of a 10–15% reduction in prison visits. In succeeding months and years, the ratio of visits per month per prisoner remained relatively flat.

If the statistics are examined in terms of the number of visitors rather than the number of visits, one finds a decrease of approximately 25% from 1994 to 1995,[7] another 24% from 1995 to 1996, and another 10–15% from 1996 to 1997. *See* Defs.' Ex. 6. Again the result of the restrictions far exceeded the original reduction goals.

Marjorie VanOchten, the former MDOC Administrator of the Office of Policy and Hearings who drafted the administrative rules concerning visitation, testified that the visiting standards that Deputy Director Bolden drafted were supposed to have an impact on volume. *See* Tr. 1, p.

66. She does not recall any discussion about increasing the use of cameras or increasing the number of staff supervising visits as an alternative method of addressing problems caused by the volume of visits. *See* Tr. 1, p. 71. She stated:

A.... [T]he idea was that the volume would be decreased by these standards and by the rules, and so you would have fewer people in the visiting room, so it would be easier for the one person who had been in the room before— there had always been an officer monitoring visits, it would be easier for that officer to monitor visits if there were fewer people.

Q. And in the standardization and with the list of 10, visits have decreased almost in half, isn't that true?

A.... that sounds right, about half. It was significant, I know.

Tr. 1, pp. 71–72.

Ms. VanOchten also indicated that there was no attempt, during the consideration and drafting of the rules, to actually quantify the number of children who were visitors or the number who would be excluded by the new restrictions. *See* Tr. 1, pp, 58, 75.

One of the concerns articulated by the Department was that the large number of visitors contributed to the volume of drugs and other contraband smuggled into the facilities. Although several MDOC witnesses testified that they believed drugs and other contraband were introduced into prison facilities through visitors, little hard data was available to confirm or refute this. Plaintiffs' Exhibit 44, compiled by Philip Creekmore from MDOC records,

---

**7.** One cannot tell how much of this decrease occurred between May and September of 1995 (and would thus be attributable to the department-wide standardization) and how much occurred between September and December 1995 (and would thus be attributable to both the standardization *and* the more restrictive operating procedures).

shows the misconduct to visit ratio from 1995 to 1997 for all facilities, i.e., the number of misconducts that were related to something which occurred during or related to a visit. With the exception of one facility, AMI, which showed a spike to six per thousand visit-related misconducts in 1996 (compared to zero per thousand in 1995 and 1997), the ratio was almost completely flat over the three year period. With respect to non-contact visitation, the MDOC acknowledged that it has no records reflecting an incident of introduction or attempted introduction of contraband during a non-contact visit since January 1, 1994. *See* Pls.' Ex. 39, ¶ 4.

Another articulated concern in passing the visitation restrictions was the safety and security of minor children. In 1994, an inmate at the MDOC Muskegon facility was found to have molested a three year old girl who had been brought to the facility by her mother (a friend of the inmate) for a prison visit. This horrible incident spurred the Department to re-examine its regulations concerning visits by minor children; the Department was also concerned generally with the security and safety issues which arose when children spent long times waiting or confined to the visiting room.

To address these concerns, the Department issued regulations through a Director's Office Memorandum 1995–58, effective August 25, 1995, limiting visits by minor children as follows:

> Visitors under the age of 18 must be the child, stepchild, or grandchild of the prisoner ...
>
> .     .     .     .     .
>
> A person under the age of 18 may be placed on a prisoner's approved visitors list only if s/he is an emancipated minor or is the child, stepchild or grandchild of the prisoner, except that in the following

circumstances, placement of the child on the list shall not be approved [if]:

> (a) The parental rights of the prisoner to the child have been terminated.

Pls.' Ex. 5; *see also* Pls.' Ex. 1 (the part of the Administrative Code which incorporated the regulations in the Director's Office Memorandum).

Thus, although siblings are considered "immediate family" for inclusion on a prisoner's approved visitor list (and thereby exempted from the quota of ten), siblings under the age of eighteen are precluded from any and all visitation, as are minor nieces and nephews, and children whose parents have terminated their parental rights. *See* Pls.' Ex. 1, Mich. Admin. Code R. §§ 791.6609(2), (6), (7).

### III. *Exclusions of Minor Siblings, Nieces and Nephews*

On the issue of sibling visitation, Department witnesses all acknowledged that they had no specific penological or other substantive concern relating to this exclusion, other than the general objective to reduce the number of children visiting to the greatest possible extent. Marjorie VanOchten, the former MDOC Administrator of the Office of Policy and Hearings, expressed in writing her concern about the narrow definition of minor children permitted to visit, but her suggestions for more flexibility were rejected. *See* Pls.' Ex. 14. Ms. VanOchten testified as following:

> Q. Let's talk about, unless they had some close relationship of the prisoner. What about a brother or sister of the prisoner? Was that rejected as simply not a close relationship?
>
> A. I don't recall a lot of discussion. I know that subsequently it became— it became more of an issue because I think we didn't realize at the time that so many prisoners would have

siblings who were under the age of 18 because, of course, if they're 18 or older, they would have been allowed under the definition of immediate family.

It's just if they were under the age of 18, and there just was not an appreciation of the number of prisoners who we would have who had siblings who were under the age of 18. I know that subsequently there was a lot of attention to that particular issue because it affected a number of people.

Q. Initially, is it fair to say that the siblings were excluded not because of any stated purpose, but because people just didn't think about it?

A. We really did not think about the impact it would have, didn't realize that there would be as many people affected as it turned out there were.

Q. But was there a specific rationale given at this time as to why siblings, some rationale that connected with the penological purpose, why the siblings, the younger brothers and sisters of prisoners should not be allowed in?

A. Not other than the general concern about children that I just articulated.

Q. The general concern you articulated about children was, we're not a day care center and children who are unrelated to prisoners shouldn't come in; is that correct?

A. Well, just that—not exactly. It's not a day care center and that the children who are allowed in should have a close relationship with the prisoner so that you would limit the number of children who were inside the prison as much as possible.

The idea was we don't like children in here at all. Let's make sure we have as small a group as possible, but we realize we have to let people see their children and their grandchildren, and so we'll let those people in, but other than that, we just wanted to keep the number of children inside the prison as limited as possible.

Q. Do you think brothers and sisters aren't close?

A. I think brothers and sisters are close, no question about it.

Q. You think they should have been included in the rules?

A. That was the recommendation that I made.

Q. Do you see any penological difficulty through security or any other concern that would be impacted by letting prisoners see their younger brothers and sisters?

.    .    .    .    .

A. The only thing would be it would expand the number of minors, children in the prison. How much, I don't know, and that might be a concern. But other than that, I don't see any concern with allowing siblings to come and visit.

Q. Did anybody ever know how many siblings you were talking about, whether it would cause any impact at all?

A. Not that I'm aware of. There was not anything done to try to quantify that.

Q. And certainly siblings weren't—minor siblings weren't pulled out as a significant source of volume in any of your discussions?

A. No, no.

Tr. 1, pp. 55–57, 58.

The new restrictions on minor visitors have had enormous negative consequences for prisoners and their families. Siblings, nieces and nephews under eighteen who had been visiting without incident could no longer see their incarcerated brothers, sisters, aunts, and uncles.[8] The prohibition on minor nieces and nephews makes it difficult for the prisoners' adult siblings to visit because they cannot bring their own children, or for the prisoners' own parents to visit if they cannot bring other grandchildren for whom they are caring, and this may even prevent the prisoner from seeing his or her own children if these relatives are caring for the prisoners' children as well.[9]

Deputy Director Dan Bolden testified that three of his major concerns related to visits by minor children were "smuggling of contraband, physical injury and sexual assault." Tr. 3, p. 33. He also stated his administrative concern about the supervision of unruly children, and his "personal and philosophical" belief that prison is "not a good place for kids to grow up," that kids should fear prison and that they should not visit because they become "too comfortable" with the prison environment. Tr. 3, pp. 33, 58–60.

On the general subject of prison visits by children, Mr. Bolden acknowledged as follows in cross examination:

Q. Could you give me an idea of the number of critical incident reports that you've—that have been issued relating to children in the visiting rooms or the parking lots?

A. I absolutely cannot. I'm speaking basically of my own personal observations from the time that I worked in prisons and the time that I visited prisons from what I observed. I don't have any documents or any numbers I can give you. Mine are from personal observations.

Tr. 3, p. 34.

A. Yes, with our visitor standards, we have continually tried to enforce children—being responsible for the children.

Q. And how do you do that?

A. By warnings and termination of visits if they're not.

Q. And do you have any idea how many times that's had to occur in the last five or six years?

A. No, I do not.

Q. Do you know if it's occurred?

A. Yes, I do know it has occurred.

Tr. 3, p. 35.

Q. Do you believe that—let me—your testimony is that you do believe that injuries are occurring in the visiting rooms?

A. I said I think injury—injuries do occur, and there's always a potential for injury to occur. When children are not supervised properly, we have moving gates, we have things that you can climb on. We have prisoner porters in a lot of institutions that are working in administration buildings, and they're working up front or on the grounds, so there is a potential for injury to a child under those circumstances.

8. *See* Shier, Tr. 2, pp. 113, 116; Spencer, Tr. 2, pp. 135, 138; Yukins, Tr. 6, p. 56; Carter, Tr. 2, pp. 168, 170–71; Smith, Tr. 2, pp. 149, 152–153; Brewer, Tr. 2, pp. 69–73; Shanks, Tr. 2, pp. 124–125, 127.

9. *See* Shanks, Tr. 2, p. 128; Pls.' Ex. 14, p. 2, ¶ 1 and p. 3, ¶ 5.

Q. Okay. So you're not saying that children are in fact being harmed. There's just a potential for harm; is that correct?

A. I'm saying that I am aware of a— I'm aware of situations where children can be harmed. I'm not—I can't cite you any specific situations where a child has been harmed. If I said that, I misspoke myself. I'm saying that there are situations in a prison environment, in the visiting room and administration building, between the gates, where a child is at some risk if they're not properly supervised.

Tr. 3, p. 37.

Q. Do you know how many children currently are visiting prisoners?

A. No, I do not.

Q. And as far as you know, there are, at least in the waiting room, no actual injuries to children; is that correct?

A. There are none that I can under oath testify to.

Q. But you are sure that there is potential for injury.

A. I'm certain of that.

Q. But today you do not have any information for us that there has been injury at least in the last four or five years; is that correct?

A. Well, I can't say that because I don't know.

Q. Well, would you at least agree that if there has been an injury or two or three, the number of injuries would be minuscule in comparison to the number of visits per year?

A. I don't have any data to substantiate that fact, but I think it would be small.

Tr. 3, pp. 39–40.

Q. Now, I'd like to get a sense of the number of children visiting before the rules, say up to 1995 and after 1995. Could you give me a sense of what percentage of children visited before, and then after the rules?

A. I can't give you a number. There was a significant number that did visit before the rule change, but I can't give you a percentage or a number, but there were a number of children that visited.

Q. In your mind, what does significant mean? Is it 5 percent, 10 percent?

A. I would say that most cases, where there was females coming to visit, there was at least one to two children with that visitor, so how do you break that out on a percentage basis, I don't know, but there were probably—prior to the rule changes, there was probably 10 to 15 percent would probably be a good number.

Q. And it's your best estimate that 10 to 15 percent of all visitors that go into the visiting room or come to the facility and are in the waiting rooms.

A. Well, they come to visit, and we're talking about pre-rule change, as I understood the question.

Q. I just want to be clear. So it would be fair to say that 10 to 15 percent of the visitors before the rules went into effect were children; is that correct?

A. That is a very rough estimate on my part.

Q. And for purposes of my question, by children, I'm meaning people under the age of 18.

A. Yes.

Q. Is that also your understanding?

A. Yes.

Q. Now, what about after the rules took effect?

A. I think the number has been substantially reduced after the rule change.

Q. To what level do you think it's reduced?

A. I don't have a precise number or percentage, but I know there's been substantial reduction in the number of children coming after the rule change.

Q. For the groups that were coming in before, the 10 to 15 percent coming in before the rule change, did you have any sense of whether they were related to the prisoner they were visiting?

A. I don't have a sense of the kinship or relationship of those that were coming prior to the rule change. I just can't tell you definitively one way or the other.

Q. Do you have any sense of, before the rule change, who the children accompanying the adult were visiting?

A. Yes. Prior to the rule change, I had some general idea that a number of the children that were coming to visit were the children of girlfriends of prisoners, they were children that were in some cases relatives, distant relatives of the prisoner. I think it just filled the whole spectrum of types of people that were coming to visit. But a lot of circumstances the children were children of the girlfriend of the prisoner.

Q. Who just were not related at all?

A. Yes.

Q. By distant relative, what do you mean?

A. Well, maybe a nephew, niece, or a cousin, people of that kinship.

Tr. 3, pp. 46–49.

Q. What changes have you made at your facilities to make them more safe for children?

A. Well, the big change, I think, to make facilities safer for everybody, is dealing with drugs and narcotics. Seems to me to be the, a central theme here.

Q. So in terms of children running around, being left abandoned in the parking lot, getting into administrative offices, you have not made any specific change that would address those things that you say make them not safe?

A. I didn't understand the question. Let me answer that question and— One of the things that we did is reduce the number. By reducing the number, you can better supervise those that are there. Before, we had visiting rooms that were packed elbow to elbow, and often out our front door, which made it very difficult to supervise children or anybody else. By reducing the number to a manageable number, our front desk staff can properly supervise and monitor what's going on.

Q. And reducing the number, are you referring to the point in time when, in 1995 when prisoners were required to have an approved visitor list?

A. I'm talking about what has happened—you asked me what had happened in the way of improvements or changes to ensure children's safety, and what I said we

have done is as a result of the new rules and the new visiting standards, we have reduced the number to a manageable number where we can properly supervise the children and the guests that are visiting in our facilities.

Q. So when you say reduce the number, you're referring to overall visitors, and not a prisoner's list?

A. Yes, I'm talk[ing] about the overall visitors.

Q. So the changes at the facilities, you have not made changes at the facilities other than the rules that are under discussion today?

A. Not other than as they relate to your question.

Q. For example, you didn't add staff or change the seats, number of seats, carpet on the floor?

A. No, we did not make any of those kind of changes.

Tr. 3, pp. 53–54.

Q. I notice in your credentials you have a degree in sociology; is that correct?

A. That's correct.

Q. And that was from what year?

A. 1967.

Q. And have you read any studies or literature that supports you in this view? [that children who visit prisoners become too comfortable with the environment]

A. No, I have not.

Q. Have you spoken with a statistically significant number of children to reach this conclusion?

A. No, I have not. I think I testified that a lot of this was my personal and philosophical rationale. I don't ever recall saying I read a study or talked to anyone.

Q. In your studies for your sociology degree, did you study child development at that time?

A. Yes.

Q. And since that time have you become aware of any studies that addressed the risk for children created by separation from the parents or how the separation would manifest differently in different age groups?

A. No, I have not read anything, and I don't advocate total separation.

Q. You're not a psychologist, are you?

A. No, I'm not.

Q. You do not purport to be able to professionally evaluate what's in the best interest of a child, do you?

A. I do not.

Tr. 3, pp. 60–61.

Q. And the department's definition of immediate family for purposes of visiting a prisoner under the age of 18 excludes brothers and sisters, nieces and nephews and cousins; isn't that correct?

A. That is true.

Q. Do you have any idea how many nieces an[d] nephews under 18 would want to visit your prisons?

A. I don't have a clue as to how many there would be.

Q. What about brothers and sisters under 18?

A. I don't have a good handle on what that number would be either.

Tr. 3, pp. 71–72.

Q. Now, are you aware that aunts and uncles that have acted as a surrogate parent to a prisoner may visit?

A. Yes.

Q. But you do not allow nieces and nephews under 18 to whom a prisoner has been a surrogate parent to visit?

A. Well, I think if someone can make a case that they provided significantly to someone's upbringing, that that's one of those cases where an exception would be sought. I was the person responsible for the language with regard to aunts and uncles, as I understand fully that a lot of the minority prisoners were raised by someone other than a natural parent.

Q. Under the rules as written, you do not allow nieces and nephews under 18 to whom a prisoner has been a surrogate parent to visit?

A. That's right.

Tr. 3, p. 73.

Q. Okay. Now, one of the points I believe you've made in your prior testimony is that your opposition, generally speaking, to nieces and nephews under 18 visiting was because you couldn't verify that they were nieces and nephews. Do you recall that testimony?

A. Yes.

Q. And isn't it the case that when a prisoner comes into the system, he comes with a presentence report that identifies family members?

A. I don't think it goes to nieces and nephews. I've looked at many, many presentence reports, and it usually covers your immediate family; mother, father, siblings.

Q. My question was does it identify brothers and sisters?

A. Yes.

Q. And the presentence report stays in the institution, and even the counselor's files, does it not?

A. Yes.

Tr. 3, pp. 76–78.

Q. If the brother or sister can produce a birth certificate of their child, doesn't that give you adequate documentation of a niece or nephew?

A. I think it would if you could get access to that kind of information.

Tr. 3, p. 78.

Thus, the thrust of Mr. Bolden's testimony is that the restrictions on visits by minor siblings, nieces and nephews evolved out of the broader desire to reduce visits by minors in general, that this broader desire was based primarily on personal observation and philosophy, and that there is no documentation or other evidence to support the need for or the efficacy of those particular restrictions. Minor siblings, nieces and nephews appear to have been restricted from visitation out of the general desire to reduce the number of minor visitors, and not because of any specific concern for their safety or the security of the prison.

Warden Joan Yukins of the Scott Correctional Facility (women) acknowledged that some of the inmates at Scott were as young as fourteen years old, that many had younger brothers and sisters who were precluded from visiting, that prior to the 1995 rule change there had been no problems at Scott related to sibling visitation, and that this particular limitation was not one she had recommended. *See* Tr. 6, pp. 56–57. She also testified that she did not know the volume of non-contact visits at Scott, nor the number of minor siblings, nieces and nephews who visited Scott prior to the 1995 rule change.

When asked about the concerns which led to the change in visitation in 1995,

former MDOC Director Kenneth McGinnis testified to many of the same issues that Mr. Bolden raised: security, overcrowding, introduction of contraband, inappropriate visiting room behavior, and sexual abuse. He also acknowledged that he was not aware of the number of minor siblings, nieces or nephews visiting MDOC prior to the 1995 rules, and that he had not considered the sibling relationship when the policy was implemented:

Q. Did you ever know how many siblings were visiting the facilities in 1994, minor siblings?

A. No, I did not.

Q. And you were never able to determine that number, were you?

A. No.

Q. Nieces and nephews, were you ever able to determine how many nieces and nephews visited your prison facilities in, let's say, '94?

A. No, I do not.

Q. And that would be the same for minor nieces and nephews?

A. That's correct.

Q. Your position is that you wanted to stop minors who didn't have a relationship with prisoners from coming in; correct?

A. Well, first, that was the primary issue, is that we really wanted to minimize any minors coming into the institution except for those who had a real purpose in being there.

Q. A real purpose. Is it your position that brothers and sisters of prisoners don't have a relationship with them?

A. No, I don't think that's my position. I think the primary relationship we were focusing on was parent-child.

Tr. 8, pp. 40–41.

Q. Did you specifically talk about excluding minor brothers and sisters with the Executive Policy Team?

A. No.

Q. Did you specifically discuss excluding minor nieces and nephews when you prepared the rules with the Executive Policy Team?

A. Yes, there was a discussion about that.

Q. There was a discussion about nieces and nephews but not siblings; correct?

A. Yes.

Tr. 8, pp. 41–42.

Although Mr. McGinnis, Deputy Director Bolden, and Warden Withrow testified that they were aware of sexual misconducts occurring in non-contact situations, no evidence was presented to establish that minor children were either involved in or able to see any such activity. *See* Withrow, Tr. 8, pp. 139–142; Bolden, Tr. 4, pp. 32–33; McGinnis, Tr. 8, p. 8, 52–55. Defendants also acknowledged in their discovery responses that a survey of all correctional facilities has revealed that no records exist reflecting or identifying incidents of sexual abuse or misconduct of minors which occurred during a non-contact visit since January 1, 1984.

Plaintiffs also introduced a statement made by Regional Administrator Denise Quarles, who stated that the exclusion of visits by minor siblings had been inadvertent, and that the Department had decided to support a change in the Administrative Rule so as to permit visits by minor siblings. *See* Pls.' Ex. 56. That change has never been implemented.

The restrictions on minor visitors have disrupted family relationships in a myriad of ways, as testified to by over a dozen

different witnesses.[10] Moreover, the penological interests identified by Defendants seem to have a weak connection, if any, to the limitations placed on minor visitors.

With respect to the issue of reducing volume generally, Defendants estimate that prior to the 1995 rule changes, 10–15% of visitors were minors. Defendants have no idea how many of these minors who visited prior to 1995 were siblings, nieces and nephews, as opposed to girlfriends' children or others unrelated to the prisoner.[11] Because nieces and nephews over eighteen can visit a prisoner so long as they fit within the prisoner's approved list of ten non-immediate family members, there appears to be no logical justification for excluding nieces and nephews under eighteen, who would also have to fit within the list, as a means of controlling the volume of visits.[12]

Although Defendants speculate that small children might be used to carry contraband, there is no evidence that relatives under eighteen present any greater risk of smuggling than relatives over eighteen,[13] and concern about smuggling was not the basis on which siblings, nieces and nephews under eighteen were prohibited from visiting.[14]

Defendants have numerous ways of controlling smuggling, even on contact visits, that do not require excluding categories of visitors. One instance of a major misconduct, such as drug smuggling, that occurs during or is associated with a visit, or one criminal act that occurs during a visit, is a basis for imposition of a permanent visiting restriction under the administrative rule and policy.[15] Defendants have adequate methods to prevent and detect drug smuggling, including the use of non-contact visits and a number of steps taken in 1995, such as implementation of the approved visitor lists, a prohibition on visitors being on multiple visitor lists if they are not immediate family, restrictions on the conduct of visits, and more intrusive searches of visitors.[16] Both prisoners and visitors involved in smuggling are subject to criminal prosecution.[17] Limiting minor siblings, nieces and nephews to non-contact visits eliminates the opportunity to smuggle in any event.[18]

---

10. See Shier, Tr. 2, pp. 113, 116–118; Spencer, Tr. 2, pp. 135, 137–144; Carter, Tr. 2, pp. 168, 170–172; Smith, Tr. 2, pp. 147, 149–154; Brewer, Tr. 2, pp. 68–78; Shanks, Tr. 2, pp. 124–128; Hendricks, Tr. 2, p. 94; Benejam, Tr. 2, pp. 27–29, 31, 41–46; Yukins, Tr. 6, p. 56; Kupers, Tr. 6, p. 154; Scarnecchia, Tr. 1, p. 197–200.

11. See Bolden, Tr. 3, pp. 47–49; McGinnis, Tr. 8, p 40; Yukins, Tr. 6, p. 117.

12. See Pls.' Ex. 1—R 791.6609(2); McGinnis Tr. 8, p. 42 (no one can get into a facility without getting on the approved list); Yukins, Tr. 6, p, 53 (to be on approved list, visitor applications must be completed, counselor checks prisoner file for information related to proposed visitor, and deputy warden approves or denies).

13. See Bolden, Tr. 4, p. 66–67 (not suggesting that siblings or nieces are more likely to smuggle than average visitor).

14. See VanOchten, Tr. 1, pp. 52, 76 (no special concern that children generally or nieces and nephews in particular are smugglers); pp. 57–58 (no security concern would be affected by letting siblings visit).

15. See McGinnis, Tr. 8, p. 51; Bolden, Tr. 4, pp. 62–63.

16. See McGinnis, Tr. 8, pp. 50–51; Bolden Tr. 3, pp. 67–68; Mintzes, Tr. 5, pp. 106–107; Kupers, Tr. 7, pp. 4–5.

17. MICH. COMP. LAWS ANN. § 800.281 (West 1998); Pls.' Ex. 40—No. 180393, Jon Weaver, p. 338, No. 186296, William Brussow, pp. 395–96.

18. See Mintzes, Tr. 5, p. 133 (non-contact visitation essentially eliminates the ability of anyone to pass anything to the prisoners); Bolden, Tr. 4, pp. 65–66 (although there is a

## IV. Non–Contact Visits

Although contact visits may be more desirable from the perspective of prisoners and their families, if contact visits are not permitted, then the visual contact that occurs on non-contact visits is crucial to the family member's ability to reassure themselves about a loved one's welfare. *See* Kupers, Tr. 6, pp. 141–42. Family members who had experience with non-contact visits found them to be a critical means of maintaining relationships because they allow for face-to-face contact and spontaneous conversation.[19]

All facilities currently have either built-in or portable non-contact visiting booths available. *See* Bolden, Tr. 3, pp. 29–30. Portable booths are built by prison industries and a warden who needed more could afford to purchase them.[20] Contact and non-contact visitors are processed in exactly the same way. *See* Benejam, Tr. 2, pp. 40–41. Portable booths can be placed in the contact visiting room at whichever spot allows for the most effective surveillance by officers and cameras.[21]

Given the 50% reduction in visiting volume and the fact that many facilities had no volume problems to begin with, it is highly unlikely that restoring non-contact visits to a limited group of people, who would have to fit on a prisoner's approved list in any event, would substantially burden Defendants' staff and resources. If Defendant finds that non-contact visits become burdensome at any particular facility or group of facilities, the Deputy Director can adjust visiting hours or take any of the other steps that are within his authority to control visits without excluding these categories of visitors altogether.[22] While Defendants cannot be required to restore minor siblings, nieces and nephews to contact visitation, Defendants could amend R 791.6609 to permit that option if it decided that contact visits for these groups were more workable after all. *See* Pls.' Ex. 56, Public Statement of RPA Denise Quarles.

To whatever extent Defendants' concerns about minors are valid, non-contact visits were designed specifically to be an alternative to contact visits where security concerns exist. Visits with whole catego-

"possibility," Deputy Director has no proof that smuggling occurs on non-contact visits because of this possibility); Bolden, Tr. 3, pp. 45–46 (doesn't know of any visitor who came for a non-contact visit that was involved in smuggling; changes of smuggling at Level 5 and 6 facilities that have only non-contact visiting are minimal); VanOchten, Tr. 1, p. 77 (limiting former prisoners to non-contact visits should eliminate the opportunity to smuggle); Yukins, Tr. 6, p. 45 (in 11 years, Warden Yukins never had an incident of a child smuggling on a non-contact visit).

19. *See* Hendricks, Tr. 2, pp. 86–87 (despite glass dividers and use of phone to talk, non-contact visits were pleasant, eventually you forgot you were at a jail and just talked, visits prevented incarceration from breaking up family); Shier, Tr. 2, p. 121 (younger children were "thrilled" to see older brother through glass at county jail because it alleviated their anxiety about his welfare); Benejam, Tr. 2,

pp. 46, 64 (mother who visited son non-contact for six months would bring young daughters and grandchildren for non-contact visits "immediately" if she could).

20. *See* Bolden, Tr. 3, p. 30 (made by prison industries), p. 55 (Defendants' current budget is over $1.5 billion); Jones, Tr. 9, pp. 54–55 (warden with institutional budget of $41 million could afford to purchase a few more portable booths if needed).

21. *See* Bolden, Tr. 3, p. 30 (booths can be moved in and out of visiting rooms); Mintzes, Tr. 5, pp. 112–13 (each institution determines placement of non-contact booths that is best for security).

22. *See* Bolden, Tr. 3, p. 66 (policy grants him authority to control visiting hours, number of visits allowed, and number of visitors per day); Pls.' Ex. 2A, PD 05.03.140, p. 4, ¶ U.

ries of individuals should not be prohibited altogether absent a reasonable basis for believing that non-contact visits will not address security concerns adequately. Other than the Higdon incident, which occurred in a contact situation, involved a very young unrelated child, and could have been prevented under existing security rules, there was no evidence presented of a problem which would justify the exclusion of whole categories of minor children from visiting.[23] The potential risk that someone will act inappropriately toward a visitor does not justify excluding an entire group of visitors. *See* Mintzes, Tr. 5, pp. 133–34. The fact that drugs can be left by visitors in bathrooms or outside buildings for pick-up by a prisoner does not logically justify denying non-contact visits by minor children. *Cf.* Bolden, Tr. 4, p. 29 (non-contact visitation does not eliminate the threat of smuggling). Concern that prisoners' girl-friends used to bring a lot of children who were unrelated to prisoners for lengthy visits does not logically justify prohibiting visits by prisoners' siblings, nieces and nephews. *Cf.* Bolden, Tr. 4, pp. 26–27.

## V. *Other Exclusions*

### A. *Former Prisoners*

The challenged regulations also exclude from visitation former prisoners who are not immediate family. The stated penological interests in this exclusion do not relate to volume, but rather to the potential for illegal or disruptive activity occasioned by such visits. However, because each prisoner is now limited to ten non-family visitors, each of whom must be screened and approved in advance of any visit, the Department has the ability to screen out any problematic former prisoner on an individual basis. Moreover, the limitation of former prisoner visits to a non-contact setting virtually eliminates the possibility of smuggling.[24]

There are many instances in which exclusion of former prisoners creates significant hardship on friends and family, including instances where former prisoners have completely rehabilitated and have served as social workers or governmental ombudsman,[25] and instances where an in-law's prior record has made it impossible for immediate family to visit.[26]

### B. *Minor Children of Prisoners Whose Parental Rights Have Been Terminated*

When the Department eliminated from visits any child of a prisoner whose parental rights had been terminated, it did not consider that some prisoners voluntarily terminate parental rights to provide adoptive homes for their children.[27] In addition, Plaintiffs submitted substantial unrefuted evidence to establish that contact between parent and child is an important ongoing need for both parent and child regardless of the basis for the termination of parental rights.[28] Moreover, any concern for the safety and security of the

---

23. *See* Pls.' Ex. 39, Defs.' Resp. to Disc. Req.

24. *See* VanOchten, Tr. 1, pp. 76–77.

25. *See* Trudeau, Tr. 4, pp. 92–103.

26. *See* Wilson, Tr. 4, pp. 104–109 (witness was incarcerated and daughter, who lived in another state, planned visit with fiancé, but was unable to visit because fiancé, who was former prisoner, was excluded from visitation; daughter was disabled and could not travel on her own).

27. *See* VanOchten, Tr. 1, pp. 59–63.

28. *See* Kupers, Tr. 6, pp. 132–134, 147–148; Scarnecchia, Tr. 1, pp. 188–201, Tr. 2, p. 20, 23; Mintzes, Tr. 5, pp. 98–99.

child during a visit would be accommodated by limiting these visits to a non-contact setting.[29]

#### C. Minor Children Must Be Accompanied By Immediate Family Members or Guardian

The stated penological concern for requiring that a minor child be accompanied by an immediate family member or guardian is the safety and security of the child. Former practice permitted a child to be accompanied by any responsible adult, designated by power of attorney. Deputy Director Bolden testified that powers of attorney were too easy to forge and that the guardianship presented more protection for the child and for the system.

According to the unrefuted evidence submitted by Plaintiffs, however, many prisoners, especially women, do not have another immediate family member available to bring their child to visit.[30] In addition, a guardianship is a complex legal responsibility and procedure, with many risks to the future legal relationship of the parent to her child, and beyond the resources of many prisoners.[31] There was no evidence establishing any instance of forgery of a power of attorney; and the pre-screening procedures established by Defendants appear completely adequate to protect against the abuse of a system utilizing a power of attorney. Finally, again, if concern for the safety of the child is an issue because the accompanying adult might not exercise the same degree of oversight and responsibility as a parent or guardian, the restriction to non-contact visits would provide adequate safety and security.

### VI. Permanent Ban on Visits Based on Two Substantive Abuse Misconducts

#### A. Penological Interest

Also in 1995, the Department implemented regulations which impose a permanent ban on visitation for any prisoner convicted of two or more substance abuse misconducts. The regulations state as follows:

BBB. Except as set forth in Paragraph EEE, the Director may permanently restrict all visits for a prisoner who is convicted or found guilty of any of the following:

1. A felony or misdemeanor that occurred during a visit.

2. A major misconduct violation that occurred during a visit or was associated with a visit.

3. Escape, attempted escape or conspiracy to escape.

4. Two or more violations of the major misconduct charge of substance abuse.

CCC. If a prisoner has been found guilty of the conduct set forth in Paragraph BBB, the warden shall recommend that all visits be permanently restricted. S/he shall submit the recommendation, along with all supporting documentation, to the appropriate RPA. The RPA shall review and forward the recommendation to the CFA Deputy Director for review. If the CFA Deputy Director agrees that the restriction is warranted, the recommendation shall be submitted to the Director for a final determination.

---

**29.** *See* VanOchten, Tr. 1, p. 77.

**30.** *See* VanOchten, Tr. 1, pp. 85–89.

**31.** *See* Scarnecchia, Tr. 1, pp. 188–91.

DDD. The CFA Deputy Director or designee shall ensure that the warden is notified of the Director's determination and that any restriction is entered into the computerized tracking system. The warden shall ensure the prisoner is notified of the Director's determination.

EEE. A prisoner whose visits have been permanently restricted shall be allowed visits only with attorneys or his/her representative, qualified clergy and staff from the Office of Legislative Corrections Ombudsman in the manner set forth in this policy.

FFF. The Director may remove a restriction upon written request of the warden or the restricted prisoner, subject to the following:

1. The restriction shall not be removed if it is based on a felony or misdemeanor that occurred during a visit or if it is based on an escape, attempted escape or conspiracy to escape associated with a visit.

2. The restriction shall not be considered for removal until at least two years after imposition of the restriction by the Director if it is based on two or more violations of the major misconduct charge of substance abuse if one or both of the charges were for possession or use of any prohibited substance other than alcohol, or if one or both of the charges were for refusal to submit to substance abuse testing.

3. The restriction shall not be considered for removal until at least six months after imposition of the restriction by the Director it if is based on a major misconduct that occurred during a visit or was associated with a visit, if it is based on an escape, attempted escape or conspiracy to escape *not* associated with a visit, or if it is based on two or more violations of the major misconduct charge of substance abuse if the charges were for possession or use of an alcoholic beverage.

GGG. If eligible for removal of the restriction based on the criteria set forth above, a prisoner may request removal of the restriction by sending a written request to the warden of the facility where the prisoner is housed.

1. If the prisoner is eligible for removal of the restriction, the warden shall submit his/her written recommendation, along with the prisoner's written request if one was submitted, to the appropriate RPA. The RPA shall review and forward the documentation to the CFA Deputy Director. The CFA Deputy Director shall review the request and make a written recommendation to the Director for a final determination. If denied, the Director shall determine when the prisoner may reapply for removal of the restriction.

2. If the prisoner is not eligible for removal of the restriction, the warden or designee shall notify the prisoner in writing of his/her ineligibility and if/when the prisoner will be eligible to apply for removal.

Defs.' Ex. 4; MDOC Policy Directive 05.03.140 (01/12/98), based on Administrative Rules 791.6607–6614, as amended 1995.

No evidence was introduced to establish that any other State has a provision similar to Michigan's permanent restriction, either in duration or in substantive content. Defendant submitted the policies of Florida, Ohio, Indiana, Pennsylvania, and New York, which were represented to have policies "similar to Michigan." *See* Defs.' Ex. 9. A review of these policies shows that they are not nearly as harsh.

Florida utilizes a three month suspension if an inmate refuses or is removed from a primary program due to "negative behavior" or is rated "unsatisfactory" for the work/program performance rating or security assessment. Further, Florida imposes a two year suspension for visit-related misconduct, which includes conduct such as engaging in sexual misconduct or possessing drugs during a visit. Only if a dangerous weapon is involved, however, is a permanent suspension imposed. *See* Defs.' Ex. 9, Florida Dept. of Corrections, Inmate Visitation, pp. 20–22.[32]

Ohio permits suspensions of visitation for a visit-related infraction (i.e. contraband found on the visitor). However, the inmate must be given notice of the time period of suspension. Further, visits may be suspended up to two months if an inmate tests positive for or is in possession of illegal drugs, or refuses to comply with a drug screen. If a second offense occurs, however, visitation may be suspended up to six months. *See* Defs.' Ex. 9, Ohio

Dept. of Rehabilitation & Correction, Inmate Visitation, pp. 6–7.

Indiana imposes a temporary suspension for a variety of infractions. No suspension lasts more than thirty days. Written notice to the prisoner is required stating the reasons, duration, and right to appeal. Furthermore, contact visits may be denied for a variety of offenses such as possession of contraband, but the inmate may still have non-contact visits. A denial of contact visits also requires notice. *See* Defs.' Ex. 9, Indiana Dept. of Corrections, Offender Visitation, pp. 8–9.

Pennsylvania permits suspension of visitation for drug infractions, but the suspension is limited to contact visits. Moreover, "[r]estriction of visiting privileges will not be used as a disciplinary measure for unrelated facility rule infraction." Defs.' Ex. 9, Pennsylvania Dept. of Corrections, Inmate Visiting Privileges, pp. 14–15.

New York permits suspension of contact visiting as punishment for visit-related misconduct, but permits non-contact visitation under these circumstances. *See* Defs.' Ex. 9, New York Dept. of Correctional Services, Inmate Visitor Program, pp. 7–14.

Thus, no other State imposes a permanent restriction on visitation other than Florida's restriction if a prisoner is involved with a dangerous weapon in a visiting situation.[33]

---

**32.** Florida's rules also state:

(c) Visiting privileges will be suspended for criminal activity, serious rule violations, repeated visiting rule or procedure infractions or any security breach. When an incident occurs the Duty Warden will ensure a comprehensive incident report is completed immediately following the incident. The Warden will review a report of the facts. Based on the report, the Warden, Assistant Warden, or Duty Warden will submit a report, with recommendations, to

CVA for final approval. CVA will notify the visitor and inmate of the final decision. Defs.' Ex. 9, Florida Dept. of Corrections, Inmate Visitation, p. 20 § 10(c).

It is unclear whether this provision relates to a prisoner or a visitor because of the final sentence. Further, this provision requires various procedural safeguards including a comprehensive incident report.

**33.** Plaintiffs' expert Terry Kupers testified that he had reviewed visiting regulations in fourteen other prison systems, non of which

Former Director McGinnis testified that Michigan's permanent restriction for two substance abuse misconducts was developed because he was committed to reducing drug use within the prison system, and that he was searching for a way to implement a zero tolerance policy. He stated as follows:

Well, based on my experience, and one of the biggest problems, one of the biggest problems that prison systems face is the introduction of drugs. It creates a tremendous amount of other issues within the prison environment, violence probably being the most predominant one.

It creates situations of trafficking for drugs, pressuring for money, but in my experience, it almost always resulted in some form of violence, eventually, in a prison environment. It creates a very dangerous atmosphere in prisons, and that's why there's so much emphasis placed on it.

Tr. 8, p. 34.

I think [the policy] sent a clear message that we were interested in zero tolerance as it involved substance abuse in prison. Did I think it was severely harsh? No.

Tr. 8, p. 62.

This testimony was amplified by Deputy Director Bolden, who testified that "our former director and I concurred, felt that we just had to take a tougher stand with regard to trying to get a handle on what is a very, very serious problem, not only in prison, but in our communities." Tr. 4, p. 51. According to both McGinnis and Bolden, the use of illegal substances in the prison system compromises security and discipline. Aggressive action was believed to be necessary in this area.

Bolden acknowledged that substance abuse misconducts trigger other automatic punishment within the prison system including loss of good time and reclassification of a prisoner's security level. Others in the MDOC, including Marjorie VanOchten, testified that the permanent ban on visitation was not tied to concerns about smuggling which occurred during the visitation process; rather, visits were chosen as the vehicle of punishment because they are very important to prisoners—and loss of visits would be a significant deprivation.

B. *Procedural Issues*

There have been many procedural problems associated with the implementation of the permanent ban on visitation. First, although Department witnesses testified that the new policy was made available to prisoners at the time of implementation, Plaintiffs introduced substantial evidence to establish that notice was spotty and inconsistent.[34]

In addition, although the implementing language suggests discretion in the imposition of the ban, there are no written criteria to guide the Director's decision.[35] Section CCC of the policy directive states that if a prisoner has two substance abuse mis-

---

had restrictions similar to those imposed by the Michigan Department of Corrections. *See* Kupers, Tr. 6, pp. 175–76.

34. *See* Defs.' Ex. 1A; McGinnis, Tr. 8, pp. 46–47; Staton, Tr. 4, p. 139 (woman prisoner saw no posting re: permanent bans). No policy directive was issued until 1998, three years after application of the ban had begun in August 1995, and restriction criteria were continually evolving. *See* VanOchten, Tr. 1,

pp. 38–40; Pls.' Ex. 5, DOM 1995–58/DOM 1996–42; McGinnis, Tr. 8, p. 47; Bolden, Tr. 3, p. 97 (possible criteria still being discussed in February 1996); Pls.' Ex. 23 (4/27/96) McKeon memo to EPT; Pls.' Ex. 27 (7/31/96 Quarles memo to Gidley).

35. *See* Pls.' Ex. 2, PD 05, 03, 140. §§ BBB, CCC.

conducts, "the warden shall recommend that all visits be permanently restricted." The warden is required to submit this recommendation, with all supporting documents, to the appropriate regional prison administrator (RPA) who, in turn, is to review the recommendation and forward it to the Correctional Facilities Administration (CFA) Deputy Director. "If the CFA Deputy Director agrees that the restriction is warranted, the recommendation shall be submitted to the Director for a final determination." Defs.' Ex. 4 ¶ CCC. Thus, the Director has absolute discretion to impose or not impose the restriction on any prisoner who has two substance abuse tickets. *See* Bolden, Tr. 3, p. 127. The CFA Deputy Director has absolute discretion to prevent a restriction from being imposed by not forwarding a recommendation to the Director. *But see* Bolden, Tr. 3, p. 127 (Deputy Director does not believe he has authority to not forward recommendation). It was understood when the new rule was adopted that a permanent visiting restriction would be imposed automatically whenever a prisoner received two substance abuse misconducts and that the director would not in fact exercise discretion on a case by case basis. *See* VanOchten, Tr. 1, pp. 103–04, 106. Although Deputy Director Bolden and Marjorie VanOchten both testified that the ban is supposed to be imposed automatically after two substance abuse misconducts, the actual practice has been inconsistent.

Over a period of nearly five years, 1715 of 4188, i.e. 41 %, of the prisoners who had two substance abuse misconducts actually received permanent restrictions. By year, the disparity ranged from 20.9% in 1996 to 59.1% in 1999. The evidence does not show to what extent this is because: a) the wardens are not recommending restrictions in all cases where they are required by policy to do so; b) the Deputy Director is exercising his discretion not to forward recommendations to the Director on some unknown and unreviewable basis; or c) the Director is deciding not to impose restrictions in a proportion of the eligible cases on some unknown and unreviewable basis. *See* Pls.' Ex. 51; Creekmore, Tr. 5, pp. 48–50. Although a warden's recommendation for restriction is supposed to be mandatory after two tickets, wardens do not in fact make these requests automatically. *See, e.g.,* Pls.' Ex. 40: No. 169509, Michael Willis, p. 274 (has misconducts at SMI in $^{11}\!\!/\!95$ and $\!/\!96$, but no request for restriction until $\!/\!97$, at MBP). Some prisoners accumulate more than two misconducts before a recommendation to restrict is made.[36]

Even more troublesome, the time lapse between the second misconduct and the imposition of the permanent restriction may take many months or even years, during which time a prisoner may be misconduct free. The average time between the guilty finding on the second substance abuse misconduct and imposition of the permanent visiting restriction has increased each year and is now nearly seven months. *See* Pls.' Ex. 47; Creekmore, Tr. 5, p. 57. Some prisoners who have two tickets do not receive a permanent restriction until three years after their last guilty

---

**36.** *See, e.g.,* Pls.' Ex. 40: No. 148325, Quincy Leonard, p. 133 (7 alcohol misconducts, all at SMI, from 12/15/95 –8/9/96, restriction request by SMI on 10/21/96.); No. 161934, Jeff Miller, p. 221 (3 misconducts in Oct/Nov 1995 at WCF, $\!/\!96$ and $\!/\!97$ alcohol misconducts at SRF, restriction request by SRF on 6/11/97); No. 226669, Gregory Winters, p. 607 (5 drug test refusals at MBP from 7/09/96–9/10/96, date of restriction request by MBP unclear but restriction imposed 11/1/96); No. 247161, David Tyran, p. 760–61 (3 alcohol tickets at MTU from 11/96–1/97, 2 marijuana tickets at MRF in $\!/\!97$, restriction request by MRF in 5/97); Yukins, Tr. 6, pp. 62–63, 65–67, 70–75; Pls.' Exs. 58, 59, 60, 61, 62.

finding.[37]   Often the restriction is not imposed until the prisoner is transferred and a request is made by the warden at the new facility.[38]   Deputy Director Bolden testified that he did not find this time delay to be problematic, because it is important that prisoners recognize the certainty of punishment for their misconduct. See Tr. 3, p. 139–140.[39]

In addition, permanent restrictions have been imposed where the underlying conduct was relatively minor or there were extenuating circumstances. See, e.g., Pls.' Ex. 40: No. 141963, Marcos Martinez, p. 105 (alcohol ticket for making "spud juice" to share with friends on New Year's); No. 178579, Gerald Gaines, p. 320 (used marijuana because mother had recently died and "was looking for escape"); No. 162312, Merion Johnson, p. 238 (used marijuana to "ease the hurt" after mother died); No. 179745, Jerold Terrell, p. 334 (just had cancer operation and accepted offer of drugs from another prisoner); No. 192100, Randy Cavallo, p. 441 (refusal to wear sweat patch because apparent allergic reaction causes itching/tested negative on numerous urine tests); No. 234985, Andre Fountain, p. 692B (misconduct was accomplice to substance abuse: for failing to tell staff that his roommate had alcohol); No. 128217, Wendall Young, p. 061, 66–67 (test refusal misconduct for 51 year old man on several meds who could not urinate within one hour allotted); No. 141352, William Irby, pp. 095, 97 (test refusal misconduct for 47 year old man on medication for prostrate condition who could not urinate within one hour allotted/ purpose of meds was to aid urination); No. 196461, Clara Wilson, pp. 515, 520–21 (test refusal misconduct for woman who could only produce small urine samples within one hour allotted and was not allowed to combine them); Clark, Tr. 4, pp. 113–14 (found guilty of drug test refusal although inability to urinate is side effect of medication); Bolden, Tr. 3, p. 163 (deputy director testified some restrictions are imposed unfairly due to "sloppy" staff work; is "not very proud" of some cases contained in Pls.' Ex. 40); Yukins, Tr. 6, pp. 76–78 (warden has no choice but to recommend permanent restriction in a case like Wilson, supra, irrespective of the underlying conduct); Kupers, Tr. 7, pp. 19–22 (a number of permanent bans were imposed for drug test refusals on people who were unable to urinate because of medications or medical conditions). Permanent restrictions have been imposed where the prisoner is known to have a history of drug addiction, alcoholism, or mental

**37.** See Brewer, Tr. 7, p. 107 (restriction imposed when prisoner request to change visitor list prompted file review); see also Pls.' Ex. 40: No. 203124, David Brewer, p. 552 (1 misconduct at CBI in $^{10}/_5$, 2 misconducts at JCF in $^1/_6$ and $^3/_6$, restriction request by JCF on 12/21/98, restriction imposed 2/99).

**38.** See, e.g., Pls.' Ex. 40: No. 104922, R.G. Stroman, p. 001 (restriction requested by JCF 3'/2 years after last guilty finding at SMN, over RPA's objection); No. 173758, Lee Arthur Love, p. 300 (restriction requested by JCF 3'/4 years after last guilty finding at DRF); No. 193320, Cardell Sanders, p. 468 (restriction requested by JCF over 3 years after last guilty finding at DRF, over RPA's objection); No. 201399, Andrew Broadnax, p. 545(restriction requested by JCF over 2½ years after last guilty finding at SMN, over RPA's objection), No. 245951, Joseph Hopkins, p. 754 (restriction requested by JCF 2 years after last guilty finding at ARF).

**39.** There are a number of other procedural problems as well. Once the underlying misconducts are established, the prisoner is not entitled to a hearing on the imposition of the permanent ban. Prisoners cannot challenge the imposition of the ban based on unusual or extenuating circumstance or for any other reason. In some instances, the ban has been imposed for two separate instances which were actually only hours apart and part of the same patterns of behavior. See, e.g., Pls.' Ex. 40: No. 178707, Napoleon Wells, p. 324 (two misconducts for possession of marijuana issued within 13 minutes during a continuing incident, one for packet thrown on ground and one for packet found in ensuing strip search); No. 238324, Michael Couch, p. 717, 720 (two misconducts, 75 minutes apart, for possessing marijuana and a drug test showing use of marijuana); No. 240505, Lawrence White, p. 734 (two misconducts within ten minutes for packet of marijuana found during search of prisoner's person and three packets found during ensuing search of cell); Bolden, Tr. 3, pp. 148–49 (concerned about unfairness of situation like Wells, supra); Withrow, Tr. 8, pp. 153–54 (had no choice but to refer White, supra, for permanent restriction).

Another significant problem with the permanent ban on visitation is that there are no standards for removing the restriction. Although the ban is characterized as "permanent," the administrative rule provides that the director may grant reconsideration and removal of the restriction, as follows:

The restriction shall not be considered for removal until at least two years after imposition of the restriction by the Director if it is based on two or more violations of the major misconduct charge of substance abuse if one or both of the charges were for possession or use of any prohibited substance other than alcohol, or if one or both of the charges were for refusal to submit to substance abuse testing.

Defs.' Ex. 4, § FFF(2).

As is clear from the rule, however, and as Mr. Bolden and Ms. VanOchten confirmed, the two-year time frame set forth in the rule is a threshold, not a cap. Many prisoners are restricted beyond the two years, and Plaintiffs' exhibits establish that there are no ascertainable criteria for the restoration of visiting privileges. The Director has absolute discretion to grant or deny a request for reinstatement, and has denied requests even where the prisoner has been misconduct free for two years. In many instances, denial of visitation rein-

statement is not reported to the prisoner in writing, nor is the prisoner told what criteria he must meet to again be able to receive visitors.

When questioned about the standards and the time period for lifting the ban, Mr. Bolden testified:

Q. Mr. Bolden, this policy does not include any statement that a prisoner must remain misconduct free in order to be eligible for restoration of visitation rights, does it?

A. No, but it doesn't say anything else either. What I look at when they send them up to me for restoration, I look at what their misconducts record has been, I look at whether or not they've been involved in programs, I look at whether or not they've been doing the things that RNGC recommended they do. The policy clearly gives me the ability to make a decision, make a determination. Maybe it should be more clearly spelled out. Unfortunately, it's not.

Q. So you agree that in many cases, restoration is expressly denied because the prisoner has one or more nonsubstance abuse major misconducts since the restriction was imposed?

---

illness that would directly relate to the misconduct—regardless of placement or progress in treatment. *See, e.g.,* Pls.' Ex. 40: No. 172502, Jeffrey Carey, pp. 293, 298 (mentally ill prisoner found guilty of possessing restricted medication for spitting out prescribed medication he was authorized to refuse); No. 245951, Joseph Hopkins, pp. 754, 756 (mentally ill prisoner found guilty of possessing medication he had kept instead of taking); No. 136547, Troy Grisson, pp. 078, 80 (marijuana misconducts by prisoner whose file shows history of drug problems before incarceration); No. 170623, James Englemann, pp. 281, 283 (drug test failures

by prisoner whose file shows history of substance abuse since age 11); Kupers, Tr. 7, pp. 12–15 (placing Hopkins, supra and Carey, supra on permanent restriction for reacting to their medication serves no purpose and is counter-productive); Bolden, Tr. 4, pp. 85–88 ("legitimate argument could be made" that permanent ban should not have been imposed on Carey, supra); Southwick, Tr. 9, pp. 152–53 (in providing information to deputy director, administrative assistant does not check on whether prisoners are mentally ill, or whether they have sought or received substance abuse treatment).

A. There could be a continuation of that if there is additional misconducts, yes.

Q. So you are in fact applying the criteria that a prisoner remain misconduct free in order to get the restrictions reinstated?

A. No, I don't think necessarily misconduct free. I'm saying major misconducts, and typically more than one. A prisoner may have acquired a series of minor misconducts, or some nonserious major misconducts. It wouldn't prohibit me from making a recommendation to the director.

Tr. 3, pp. 156–57.

Q. When it comes to restoring the visits, isn't it the case that you often do not forward the request to the director and in fact send it back, deny it for reasons of your own and send it back to the warden?

A. That's true, yes.

Q. And does it not also often occur that when a restoration is denied, you do not, in the document that goes to the prisoner, advise the prisoner when they could next apply or the terms by which they must—

A. We try to. There's a conscious effort in my office to do that. I'm not going to sit here under oath and say it happens every time, but I have asked the folks in my office that do this in my behalf, give the prisoner a date to shoot for.

Q. So are you saying it would not surprise you if in fact prisoners are told to stay misconduct free without an end date?

A. It shouldn't be that way, but I'm not going to be surprised that you might find some that are that way, but I think you need to give the prisoner a target or a goal to work for, and I know my intent when they go out, that we give a prisoner a date to look forward to; I'll look at it in six months or three months or whatever amount of time.

Tr. 3, pp. 159–60.

Q. Now, in terms of the reapplication periods when you do specify them, it appears that they range anywhere from six months to 12 months, and sometimes up to 24 months. Is there some criteria that you can point to in making these various determinations, or is it pretty much a file-by-file situation?

A. I think it has to be a file-by-file situation. If an individual is making progress, trying to improve their behavior, and I see some progress looking in the file, I may say six months. I may say 12 months for somebody else who is slick and doesn't get caught, but for the guy that constantly gets in trouble and gets misconducts on a regular basis, for that person to go two months, three months, six months, he or she has really worked at it, and so you give them a little bit more of a carrot versus a guy that is involved in drugs and you never catch him.

Q. How do you determine somebody is slick by the misconduct reports?

A. Well, you don't necessarily—you look at their record. A lot of these guys I know that are involved in the drug business and that get misconducts for narcotics.

Q. Do you sometimes discuss the prisoner with the warden before you make a ruling?

A. I have, but not on a regular basis. I would be dishonest if I said that I have on a few cases, I've talked to

the wardens or I've talked to someone about a prisoner, and I've been around for 27 years, and I know a lot of prisoners in the system.

Tr. 3, pp. 161–62.

Despite the timing criteria of subsection FFF, some prisoners restricted for a mixture of alcohol and non-alcohol substance misconducts are considered for restoration after six months, while others are required to wait two years.[40] Although subsection FFF places the burden for requesting restoration on the prisoner, there is no requirement that prisoners be notified of when, how, and on what basis restoration may be requested, and they often do not, in fact, have this information.[41] The actual practice of requesting restoration is confusing and unclear. In some cases, review of a permanent restriction is apparently initiated by the central office. See Pls.' Ex. 40: No. 159580, Keith Young, p. 177 (warden conducts six month review in response to e-mail from Deputy Director's staff). Although in many cases the director's restriction memo affirmatively states, in bold type: "I will review this case in six months", this review did not in fact routinely occur.[42] Although subsection GGG says that when timing criteria have been met wardens must submit prisoner requests for restoration to the Deputy Director though the RPA, Defendants advise wardens not to forward requests unless the wardens are recommending reinstatement, thus effectively putting the restoration decision in the wardens'

**40.** *Compare, e.g.,* Pls.' Ex. 40: No. 134352, David Purnell, p. 069 (one alcohol and one test refusal; Director's 11/4/97 restriction memo says: "I will review this case in six months."); No. 163852, Patrick Turner, p. 249 (two alcohol and one positive marijuana test; Director's 9/6/96 restriction memo says: "I review ... in six months"); No. 169509, Michael Willis, p. 274 (one alcohol and one marijuana possession; Director's 2/10/97 restriction memo says: "I will review this case in six months.") with No. 128217, Wendell Young, p. 061 (one alcohol and one urine test refusal, 4/5/99 permanent restriction); No. 141963, Marcos Martinez, p. 102 (one alcohol and one marijuana possession, 4/5/99 permanent restriction); Bolden, Tr. 3, pp. 149–50; Bowyer, Tr. 4, pp. 185–89, 192 and No. 191172, Harrison Bowyer, p. 408 (warden recommended restriction for 1996 and 1999 alcohol misconducts that would have allowed restoration in six months, but deputy director imposed permanent restriction on 2/3/00 for 1999 alcohol and 1997 restricted meds). Despite the timing criteria of § FFF, some prisoners who have only alcohol related misconducts are required to wait a year before requesting restoration instead of just six months. *See, e.g.,* Pls.' Ex. 40: No. 148325, Quincy Leonard, p. 131 (multiple alcohol tickets, Deputy Director recommends one year restriction, Director's 11/22/96 restriction memo says: "1 will review this case in twelve months"); No. 175338, David Byard,

p. 307 (three alcohol tickets, Deputy Director recommends one year restriction, Director's 11/8/96 restriction memo says: "I will review this case in twelve months."); Bolden, Tr. 3, pp. 150–51.

**41.** *See* McGinnis, Tr. 8, p. 70; Bolden, Tr. 3, pp. 156–57; Kupers, Tr. 6, p. 177; Bowyer, Tr. 4, p. 182 (prisoner notified by mail that visits were restricted had to write prison officials seeking information before being told restoration would not be considered for two years); Clark, Tr. 4, p. 115 (written notice of restriction said nothing about when or how it could be lifted); Staton, Tr. 4, pp. 139–40 (prisoner believed ban was permanent because given no information re: how to get it lifted).

**42.** *See* No. 163852, Patrick Turner, p. 249; No. 169509, Michael Willis, p. 274; No. 258127, Rufus Neely, pp. 789, 792; No. 237034, Benjamin Atkins, pp. 693, 698; McGinnis, Tr. 8, pp. 67–70. Atkins is a particularly troubling case. The prisoner's restriction was supposed to be reviewed (and rescinded) in June 1997. This review did not occur. Atkins, dying of AIDS, was hospitalized over the summer. His mother made numerous contacts with the Department to try to get Atkins' visits reinstated. By the time the Department got around to reviewing and reinstating the visits, Atkins had died.

hands.[43] Although subsection GGG says the Deputy Director is to make a written recommendation regarding restoration requests to the Director, and the Director is responsible for the final decision, in fact the Deputy Director regularly advises wardens that he is not forwarding requests to the Director and denies restoration for reasons of his own.[44] Although subsection GGG says that when restoration is denied, the Director is to determine when the prisoner may reapply, in fact the Deputy Director regularly denies restoration without specifying a next application date.[45] When reapplication periods are specified, they range from six months to twelve months to twenty-four months, without any apparent uniform standard being applied.[46]

Of the 1576 prisoners placed on permanent restriction from August 1995 through December 1999, 1124 were still on restriction in May 2000. This included 72% of those restricted in 1995, 53% of those restricted in 1996, and 53% of those restricted in 1997. See Pls.' Ex. 50; Creekmore, Tr. 5, pp. 51–54. Twenty-four people had their visits restored in less than six months. See Pls.' Ex. 48. Of the 453 prisoners whose visits were restored through 1999, 49.4% spent less than twenty-seven months on restriction and 50.6% spent twenty-seven months or more. See Pls.' Ex. 48; Creekmore Tr. 5, pp. 54–56.

43. See Pls.' Ex. 40: No. 180393, Jon Weaver, p. 337 ("In all cases where Wardens do not recommend reinstatement, they need not notify Deputy Director Bolden."); No. 209803, James Risk, p. 580 ("You need not forward any requests to us unless the prisoner is eligible and you recommend reconsideration.").

44. See, e.g., Pls.' Ex. 40: No. 158018, Gregory Dudley, p. 167; No. 225182, Demond Heidelberg, p. 595; No. 239781, Julian Thurman, p. 725; No. 162312, Merion Johnson, p. 234; No. 238324, Joseph Van Buskirk, p. 745; Pls.' Ex. 1, R 791.6609(12); Bolden, Tr. 3, p. 159; Tr. 4, pp. 79–80.

45. See, e.g., Pls.' Ex. 40: No. 158018, Gregory Dudley, p. 167 (Dep. Director requires "further demonstration of misconduct free behavior" for unspecified time period, though prisoner is scheduled to parole in 50 days); No. 162312, Merion Johnson, p. 234 (where restriction had been in effect over two years and only intervening misconduct was 10 month old marijuana use, Dep. Director requires "further demonstration of misconduct free behavior for unspecified time period"); No. 225182, Demond Heidelberg, p. 595 (further demonstration of misconduct free behavior required for unspecified time period); No. 239781, Julian Thurman, p. 725 (Dep. Director wants unspecified period of misconduct free behavior "before I will seek reinstatement of his privileges"); Bolden, Tr. 3, pp. 159–61.

46. See, e.g., Pls.' Ex. 40: No. 159580, Keith Young, p. 177 (prisoner already on restriction for 14 months who had two additional alcohol misconducts must remain misconduct free for 12 more months before Dep. Director will recommend restoration); No. 238324, Michael Couch, p. 706 (prisoner restricted on 3/12/98 who has "various" subsequent misconducts, including one for restricted meds, has restoration request denied on 5/15/00 by Dep. Director who say request may be resubmitted six months from then); No. 243518, Joseph Van Buskirk, p. 745 (prisoner who had four additional substance abuse misconducts after restriction, but before completing substance abuse treatment, is denied restoration eighteen months after last ticket for "poor adjustment"; may resubmit request in another six months); No. 249102, Brian Mixen, p. 776 (prisoner with six non-substance abuse misconducts during two years on restriction must be one year misconduct free from last ticket before restoration will be considered); No. 258127, Rufus Neely, p. 789 (prisoner who has one additional substance abuse misconduct during 22 months on restriction for two alcohol tickets must be misconduct free for two years from date of that misconduct); Bolden, Tr. 3, pp. 161–62 (prisoner who gets misconducts often will be given shorter reapplication period than prisoner "who is slick and doesn't get caught" but who deputy director personally believes is involved in drug business).

By May 2000, 149 prisoners had been on restriction for 3-1/2 years or longer.[47]

## C. *Substantive Problems*

In addition to the procedural problems related to the permanent ban, many substantive issues are also problematic.

Defendant originated and implemented the concept of using permanent visiting restrictions as a punishment for substance abuse as part of its zero tolerance philosophy, under which a single instance of substance abuse is defined as a problem. *See* VanOchten, Tr. 1, p. 95; McGinnis, Tr. 8, pp. 61–63; Yukins, Tr. 6, pp. 59–60; Caruso, Tr. 8, p. 101. The use of permanent visiting restrictions was not motivated by any Department-wide rise in substance abuse. In fact, random drug testing begun in the late 1980's had brought drug use down. *See* VanOchten, Tr. 1, pp. 98–99. Although Department officials testified that substance abuse by prisoners is a major problem because it can lead to violence and creates a dangerous atmosphere, the statistical evidence indicates that the incidence of prisoners abusing substances is "well below ten percent." Kupers, Tr. 7, pp. 38–39. Further, Defendants acknowledge that they did not have enough treatment programs available to handle the prisoners battling substance abuse problems, and that their facilities were not able to provide specialized appropriate substance abuse treatment in many instances. *See* VanOchten, Tr. 1, pp. 96–97. There was no testimony regarding violence levels before or after permanent restrictions were introduced. *See, e.g.,* Caruso, Tr. 8, p. 96; Bolden, Tr. 4, p. 51. Mr. McGinnis acknowledged that he had testified in 1994 that Michigan prisons "were well managed, well controlled and had an absence of violence: and that violence was extremely low in Michigan compared to other states." McGinnis, Tr. 8, p. 52. Permanent visiting restrictions are not imposed for misconducts involving violence or threats of violence, even though Mr. McGinnis testified that there is "no acceptable level of violence" and that "the standard is that there will be no violence." McGinnis, Tr. 8, p. 74; *see* Benejam, Tr. 2, p. 64 (son just limited to non-contact visits while appealing misconduct finding for starting a riot).

Although several of Defendants' witnesses expressed their opinions that substance abuse went down after implementation of the permanent restriction penalty, no data was introduced regarding any changes in the actual amount of substance abuse that occurred, any changes in the quantity of substance abuse misconducts issued, nor the extent to which any changes that did occur might have other causes.[48] Plaintiffs' expert testified that although a high proportion of prisoners have substance abuse problems when they enter prison and after they leave it, substance abuse while in prison is not a large problem and does not warrant the massive injury caused by separating family mem-

---

47. *See* Pls.' Ex. 50; *see, e.g.,* Pls.' Ex. 40: No. 110133, Charles Jackson, p. 007; No. 148325, Quincy Leonard, p. 131; No. 152829, Curtis Lewis, p. 149; No. 159580, Keith Young, p. 177; No. 163852, Patrick Tumer, p. 249; No. 170633, James Englemann, p. 281; No. 175338, David Byard, p. 307; No. 178707, Napoleon Wells, p. 324; No. 193525, Richard Custard, p. 474; No. 220990, James Larry, p. 585; No. 225182, Demond Heidelberg, p. 595; No. 226669, Gregory Winters, p. 607.

48. *See* Caruso, Tr. 8, pp. 87–89; Withrow, Tr. 8, p. 151 (has not studied extent of reduction and drug problems at Reformatory "was not terribly extensive prior to these changes."); Jones, Tr. 9, pp. 36–38; McGinnis, Tr. 8, pp. 75–76 (former director could not say whether substance abuse misconducts went up or down).

bers through permanent restrictions. *See* Kupers, Tr. 6, p. 171, Tr. 7, pp. 6–7.

In addition, the lack of standards and procedures for the restoration of visiting privileges has had a significant negative impact within the MDOC. Department officials indicated that restoration was denied for widely disparate reasons, depending on the identity of the decisionmaker.[49] Some people have had their visits restricted for well over two years despite recommendations for restoration from wardens.[50]

Since wardens are given no explanation when their recommendations for restoration are rejected, they cannot explain the decisions to prisoners.[51]

Even more egregious, permanent restrictions for substance abuse have been converted sub rosa into a tool for general behavior management, where restrictions are routinely continued on the basis of behavior for which policy does not authorize a visiting restriction in the first instance.[52] Using non substance-abuse mis-

**49.** *See* McGinnis, Tr. 8, p. 64 (type of drugs involved, "nature of the case"); Bolden, Tr. 3, p. 157 (misconduct history, program involvement, RNGC recommendations); Southwick, Tr. 9, pp. 140–41 (standards "more or less" in her head, include continued pattern of substance abuse or other disruptive behavior); Caruso, Tr. 8, pp. 94, 110 (lack of further substance abuse not enough, considers other misconduct, prisoner's full history); Jones, Tr. 9, pp. 35–36, 56 (in addition to being free of substance abuse misconducts, prisoner must demonstrate "extended period of positive behavior"; considers other major misconducts, refusals to participate in school or counseling, "how well they've done on their institutional assignment", "irresponsible behavior"); Langley, Tr. 9, pp. 79–80 (institutional behavior and substance abuse history; will not restore until at least one year after last substance abuse ticket); Yukins, Tr. 6, p. 82 (does not recommend restoration if "not comfortable" doing so).

**50.** *See, e.g.,* Pls.' Ex. 40: No. 162312, Merion Johnson, p. 234 (prisoner restricted on 4/29/97 for refusing drug test and possession of marijuana remains on restriction despite 4/8/99 recommendation by warden to restore); No. 163852, Patrick Turner, p. 249 (wheelchair bound prisoner restricted on 9/6/96 for alcohol and marijuana use who is at Level 5 facility for being management problem and has lost phone privileges remains on restriction despite 9/23/97 recommendation from warden to restore because visits would be non-contact, might encourage compliance with institutional rules, and would afford family support); No. 249102, Brian Mixen, p. 776 (prisoner restricted on 1/15/97 for alcohol and marijuana use still on

restriction despite 1/19/99 recommendation from Warden Caruso to restore because no more substance abuse misconducts after restriction); No. 243518, Joseph Van Buskirk (prisoner restricted on 10/8/97 for dirty urine and refusing drug test denied restoration despite positive recommendation from Warden Caruso, no misconducts for eighteen months, and completion of substance abuse treatment); Bolden, Tr. 3, pp. 151–52.

**51.** *See* Withrow, Tr. 8, pp. 154–55; Yukins, Tr. 6, pp. 83–84. Unexplained disparate restoration decisions lead prisoners to feel they are being treated unfairly, which in turn causes anger, irritability, obsessive resentment and increased acting out. *See* Mintzes, Tr. 6, pp. 13–15; Kupers, Tr. 6, pp. 164–65.

**52.** *See, e.g.,* Pls.' Ex. 40: No. 158018, Gregory Dudley, pp. 167–69 (restoration denied to prisoner who had completed substance abuse treatment and had excellent work reports because of five subsequent tickets, including insolence, restricted meds, and three "out of place"); No. 225182, Demond Heidelberg, p. 595 (restoration denied to Level 5 prisoner with multiple subsequent misconducts, none related to substance abuse); No. 233162, David Wood, p. 692A (6 month restriction for two alcohol misconducts continued indefinitely after Warden Caruso recommends no restoration based on one misconduct for disobeying a direct order);No. 239781, Julian Thurman, p. 724 (restoration denied more than three years after restriction imposed based on eight subsequent misconducts, none for substance abuse); No. 249102, Brian Mixen, p. 776 (restoration denied at six month review because of one ticket for unauthorized occupation of a cell; restoration denied after

conducts to extend a visiting ban imposed for substance abuse is perceived by prisoners to be unfair and excessive, and several witnesses, including Plaintiffs' experts, testified that this procedure is counterproductive to the penological interests identified by Defendants. *See* Kupers, Tr. 7, pp. 16–18. The arbitrariness and unfairness of the permanent restriction process makes the trauma of the restriction harder to bear and actually increases the tendency to resort to medication or drugs. *See* Kupers, Tr. 6, pp. 178–79.

### CONCLUSIONS OF LAW

Visitation has been recognized by judges and criminal justice professionals as an important aspect of prison life, because it aids in rehabilitation, preserves the family unit, positively influences reintegration of prisoners into society, and decreases recidivism. As Justice Marshall observed in his dissent in *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 465, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (Marshall, Brennan, Stevens, JJ., dissenting):

Confinement without visitation "brings alienation and the longer the confinement the greater the alienation. There is little, if any, disagreement that the opportunity to be visited by friends and relatives is more beneficial to the confined person than any other form of communication."

"Ample visitation rights are also important for the family and friends of the confined person.... Preservation of the family unit is important to the reintegration of the confined person and decreases the possibility of recidivism upon release.... [V]isitation has demonstrated positive effects on a confined person's ability to adjust to life while confined as well as his ability to adjust to life upon release...."

*Thompson*, 490 U.S. at 468, 109 S.Ct. 1904 (quoting National Conference of Commissioners on Uniform State Laws, Model Sentencing and Corrections Act § 4–115, Comment (1979)).

The United States Supreme Court acknowledged in *Thornburgh v. Abbott*, 490 U.S. 401, 407, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) that "[a]ccess [to prisons] is essential ... to families and friends of prisoners who seek to sustain relationships with them."

Notwithstanding the importance of visits, both to the prisoner and to the penological goal of rehabilitation, the experience of incarceration necessarily imposes limits and restrictions on a prisoner's interactions with persons beyond the prison walls. Some prisoners are housed in facilities which are far away from family and friends. The United States Supreme Court has held that:

The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.... Perhaps the most obvious of the First Amendment rights that are necessarily

---

two years based on total of six misconducts after restriction, none for substance abuse); No. 242794, Kenneth Pringle, p. 744A (6 month restriction for two alcohol misconducts continued for 6 months based on two non-substance abuse misconducts; Warden Caruso had recommended requiring one year misconduct free before reconsideration "since visiting is considered a privilege."); No. 263692, Jack Hodges, p. 799A (6 month restriction for two alcohol misconducts continued for 6 months for three non-substance abuse misconducts; Warden Kapture had recommended no restoration until 6 months misconduct free and 6 months satisfactory work or school performance); Bolden, Tr. 3, pp. 157–58; Caruso, Tr. 8, p. 94 (permanent restriction is "powerful tool" in managing prisoners; will not restore visits unless prisoners are "behaving themselves").

curtailed by confinement are those associational rights that the First Amendment protects outside of prison walls. The concept of incarceration itself entails a restriction on the freedom of inmates to associate with those outside the penal institution.

*Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125–26, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977).

The First Amendment, which is applied to the States through the Fourteenth Amendment, protects the right of association in certain circumstances. U.S. CONST. amend. I; *see NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The Supreme Court has "noted two different sorts of 'freedom of association' that are protected by the United States Constitution:

'Our decisions have referred to constitutionally protected 'freedom of association' in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment-speech, assembly, petition for the redress of grievances, and the exercise of religion.' "

*City of Dallas v. Stanglin,* 490 U.S. 19, 24, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)).

As for the first line of decisions, "[m]any courts have recognized liberty interests in familial relationship other than strictly parental ones." *Trujillo v. Board of County Commissioners of Santa Fe County,* 768 F.2d 1186, 1188 (10th Cir.1985) (citations omitted). Further, the First Amendment and the Fourteenth Amendment protect the fundamental rights to establish and maintain family relationships and to make child-rearing decisions. *See Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (stating that natural parents have a fundamental liberty interest "in the care, custody, and management of their child"); *Moore v. City of East Cleveland,* 431 U.S. 494, 505, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (stating that "[o]urs is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition"); *Cleveland Board of Educ. v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In addition, "the freedom of intimate association protects associational choice as well as biological . connection. *Trujillo,* 768 F.2d at 1188 (citing *United States Jaycees,* 104 S.Ct. at 3249–51; *see generally* Karast, *The Freedom of Intimate Association,"* 89 Yale L.J. 624 (1980)).

Both the prisoners themselves and their prospective visitors are entitled to the protection of these rights, always with the acknowledgment that the demands of the

prison system may involve significant restriction. In fact, the Supreme Court has specifically stated that "[i]nmates clearly retain protections afforded by the First Amendment." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citing *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800 (1974)); *see Austin v. Hopper*, 15 F.Supp.2d 1210, 1231–32 (M.D.Ala.1998); *but see Long v. Norris*, 929 F.2d 1111, 1118 (6th Cir.1991) (stating that "[i]n the Sixth Circuit, we have not decided the degree to which prison inmates retain their freedom of association). Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Inmates "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).[53]

■ However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948), *overruled on other grounds by McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *see Pell*, 417 U.S. at 822, 94 S.Ct.

2800. "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone*, 482 U.S. at 348, 107 S.Ct. 2400 (citations omitted). Accordingly, in the First Amendment context, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822, 94 S.Ct. 2800.

■ Therefore, in order to grant prison officials the appropriate deference in dealing with prison matters, the courts apply a reasonableness standard "when a prison regulation impinges on inmates' constitutional rights." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Accordingly, a regulation is valid if it is "reasonably related to legitimate penological interests." *Id.* In making this determination, a court must balance the following four factors:

1. whether a valid, rational connection between the prison regulation and the legitimate governmental interest exists;

2. whether there are alternative ways for the prisoner to exercise the implicated constitutional right;

53. Although this Court found in its earlier opinion that "no First Amendment rights of freedom of association exists for prisoners," *Bazzetta v. McGinnis*, 902 F.Supp. 765, 770 (E.D.Mich.1995), that overly broad statement is not consistent with the Supreme Court precedent cited above. As Justice Frankfurter observed in *Henslee v. Union Planters National Bank & Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting), "[w]isdom too often never comes and so one ought not to reject it merely because it comes late." A better formulation of the law would be to state that the Sixth Circuit had not addressed "the degree to which prison inmates retain their freedom of association," *Long v. Norris*, 929 F.2d 1111, 1118 (6th Cir.1991), and that the Court must use the *Turner* analysis to resolve those issues on specific cases. As the Sixth Circuit stated in its earlier decision in this case, "there is no inherent absolute right to contact visits with prisoners," and "a properly imposed ban on contact visits will survive claims of Due Process [and First Amendment] violation." *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir.1997). These statements recognize the existence of constitutional rights related to visits although limited by the constraints of incarceration. Thus, the *Turner* analysis must be utilized to evaluate the legitimacy of the restrictions.

3. what impact would accommodation of the implicated constitutional right have on the prison administration; and

4. whether the regulation is an exaggerated response to prison concerns.

*Id.; see O'Lone,* 482 U.S. at 342, 107 S.Ct. 2400 (1987) (holding that prison regulations precluding certain religious services did not violate the First Amendment); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (rejecting the inmates' First Amendment challenge to the union meeting and solicitation restrictions as rationally related to the central objectives of prison administration); *Pell,* 417 U.S. at 817, 94 S.Ct. 2800 (1974) (rejecting the inmates' First Amendment challenge to the ban on media interviews because the regulation prohibited only one means of communication); *Caraballo–Sandoval v. Honsted,* 35 F.3d 521, 525 (11th Cir.1994) (stating that "as to the First Amendment claim, inmates do not have an absolute right to visitation, such privileges being subject to the prison authorities' discretion provided that the visitation policies meet legitimate penological objectives"); *Nicholson v. Choctaw County,* 498 F.Supp. 295 (S.D.Ala.1980); *Laaman v. Helgemoe,* 437 F.Supp. 269, 320 (D.N.H.1977) (holding that "a total denial of visitation or unreasonable restrictions on visitation privileges does implicate the First Amendment rights of any inmate").

■ In applying the *Turner* test, Defendants bear the burden of demonstrating that the challenged regulation is reasonably related to a valid penological objective. "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner,* 482 U.S. at 90, 107 S.Ct. 2254.

Although the Sixth Circuit has emphasized that "problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts," *Bazzetta v. McGinnis,* 124 F.3d 774, 779 (6th Cir.1997), the court has also cautioned that deference does not mean blind acceptance of the proffered rationales. *See Whitney v. Brown,* 882 F.2d 1068 (6th Cir.1989). Thus, a State may not "arbitrarily deprive prisoners of all contact with family and friends." MICHAEL MUSHLIN, RIGHTS OF PRISONERS § 12.01 (2d ed.1993).

The Sixth Circuit has held, in an earlier decision in the instant case, that the restrictions concerning minor children and former prisoners are constitutional in the context of contact visitation. *See Bazzetta,* 124 F.3d at 779. With respect to non-contact visits, however, the Sixth Circuit first held that "[a]ppellants err in their contention that the restrictions at issue apply to both contact and non-contact visits. A fair reading of the amendments makes it clear that they apply only to the former." *Id.* In a subsequent decision, the Court explicitly denied the MDOC request to extend the holding to the non-contact setting. *See Bazzetta v. McGinnis,* 133 F.3d 382, 384 (6th Cir.1998). And indeed, the balance of the *Turner* factors appears to be quite different if one considers the non-contact environment.

The penological interests articulated by the Defendants with respect to the regulations affecting minor children and former prisoners are 1) preventing children from suffering physical and sexual abuse; 2) preventing children from being injured in the non-child-proofed visitation rooms; 3) preventing the smuggling of weapons, drugs or other contraband; and 4) reduction of overall volume so as to ease the overcrowding of visiting rooms and the administrative burden on prison staff.

As discussed above, Defendants made no attempt to quantify the number of minor children or former prisoners who would be excluded by the new regulations; defendant conceded that the number was probably small. Furthermore, the establishment of the visiting standards and the limited 10–visitor list for each prisoner had already reduced the volume of prison visitors by approximately 50%. Thus, there is no logical connection between the challenged regulations and the need to reduce volume.

With respect to the other articulated penological interests, the confinement of these excluded visitors to non-contact visits would fully address any issue of abuse, potential injury or the opportunity for smuggling. Thus, there is no valid rational connection between the regulation which excludes minor siblings, nieces and nephews and former prisoners, from non-contact visitation—and the governmental or penological interest motivating the rule.

Similarly, with respect to the restrictions on who may accompany a minor child and on the elimination of visits by children whose prisoner parents have had their rights terminated, the limitation to non-contact visits would meet any concern about the safety and security of the children. There was no evidence presented to suggest that volume is an issue supporting these regulations. And with respect to Defendants' objective of eliminating administrative burden, the process of screening for the 10–visitor list already addresses this. Any adult bringing a minor child would have to go through the screening process of the visitor list approval; each prisoner is entitled to have ten visitors on their list, so the screening of an adult authorized to accompany a minor child would create no greater burden than that already imposed by the regulations. Finally, although Defendants claim that there could be a problem with forgery or authorizing documents such as power of attorney, no evidence supports that claim.

With respect to the remaining *Turner* factors, Plaintiffs also prevail. Uncontroverted evidence establishes that letters and telephone calls are not adequate alternate means of staying in contact with minor children. The use of non-contact visits for these now excluded visitors would have no impact on guards or other inmates, and a minimal impact on the allocation of prison resources. And the existence of the obvious alternative of non-contact visitation is in itself evidence that the regulation is not reasonable.

Therefore, the Court finds that Plaintiffs have prevailed in establishing the unconstitutionality of the MDOC regulations excluding minor siblings, nieces and nephews, excluding former prisoners, requiring that minor children be brought by an immediate family member or guardian, and excluding children whose prisoner parents have had their parental rights terminated. The restrictions are not reasonably related to legitimate penological interests when considered in the context of non-contact visitation.

## I. Permanent Ban on Visits Based on Two Substantive Abuse Misconducts

### A. Eighth Amendment

The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits "cruel and unusual punishment" to those convicted of crimes. U.S. CONST. amend. VIII. The Supreme Court has interpreted the Amendment "in a flexible and dynamic manner." *Gregg v. Georgia*, 428 U.S. 153, 171, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In the earlier cases, the Supreme Court applied the Eighth Amendment to barbarous physical punish-

ments. *See In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *Wilkerson v. Utah,* 99 U.S. 130, 9 Otto 130, 25 L.Ed. 345 (1878). However, more recently, the Supreme Court has extended the Eighth Amendment to cover punishments which " 'involve the unnecessary and wanton infliction of pain,' " "are grossly disproportionate to the severity of the crime," or "are 'totally without penological justification.' " *Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (quoting *Gregg,* 428 U.S. at 173, 96 S.Ct. 2909; *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion); *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910)).

The Eighth Amendment "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency' ... against which [courts] must evaluate penal measures." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285 (1976) (quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (8th Cir.1968)). Accordingly, the Amendment " 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' " *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)).

■ The present case involves a condition of confinement. Specifically, it involves a permanent ban on visitation when an inmate has two substance abuse violations. "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). The Supreme Court stated:

When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment....

*DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

■ In order to hold that a condition of confinement violates the Eighth Amendment, two requirements must be met. The first requirement is that the deprivation must be "sufficiently serious." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392. In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the Court held that lodging two inmates in a single cell was not "sufficiently serious," and, therefore, did not constitute cruel and unusual punishment under the Eighth Amendment. The Court stated that the Constitution "does not mandate comfortable prisons," but prohibits only those deprivations which deny "the minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. 2392.

The second requirement is that a prison official must have a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson,* 501 U.S. at 297, 111 S.Ct. 2321). "In prison conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (citing *Wilson,* 501 U.S. at 302–03, 111 S.Ct. 2321). That is, "[a] prison offi-

cial's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828, 114 S.Ct. 1970 (citing *Helling,* 509 U.S. at 25, 113 S.Ct. 2475; *Wilson,* 501 U.S. at 294, 111 S.Ct. 2321; *Estelle,* 429 U.S. at 97, 97 S.Ct. 285). The Court defined deliberate indifference as "know[ing] that inmates face substantial risk of serious harm and disregard[ing] that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847, 114 S.Ct. 1970. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence.... [A]nd a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970.

■ This Court holds that the permanent ban on visitation for two substance abuse misconducts violates the Eight Amendment's prohibition against cruel and unusual punishment. *See Laaman v. Helgemoe,* 437 F.Supp. 269, 322 (D.N.H.1977) (stating that "[u]nreasonable restrictions on visitation ... involves the Eighth Amendment where the failure to allow inmates to keep their community ties and family bonds promotes degeneration and decreases their chances of successful reintegration into society").

The unrefuted evidence establishes that visitation with family and friends is the single most important factor in stabilizing a prisoner's mental health, encouraging a positive adjustment to the prisoner's term of incarceration, and supporting a prisoner's successful return to society. *See* Kupers, Tr. 6, pp. 130–35. Dr. Kupers testified about the profile of the Michigan's prison population as follows:

Generally, prisoners in Michigan and nationwide, and not really much variance in the two, are very poor, they're from low income backgrounds, they have very little education. 40 some percent are functionally illiterate. They tend to be disproportionately African American and Hispanic; close to 50 percent African American, and another 15 to 20 percent Hispanic and other minorities.

They tend to have experienced repeated and severe traumas throughout their life, including physical and sexual abuse. The sexual abuse is more prevalent in women prisoners than in men. There's a very high incidence of certain diseases; for instance, HIV and AIDS and hepatitis C, approximately six to ten times the rest of the population.

Mental illness is very prevalent. There's between 16 and 25 percent of prisoners suffer from a significant mental illness warranting treatment. The DOJ released a report approximately a year ago that 283,000 prisoners in the nation suffer from serious mental illness.

And in terms of substance abuse, various estimates are between 60 and 80 percent of prisoners suffer from significant substance abuse.

Kupers, Tr. 6, pp. 129–30.

With respect to the overall importance of visitation, Kupers went on to say:

[P]risoners with any length of sentence who had three people who they had quality and continuous contact with during their entire term of incarceration were ⅙ as likely to be back in prison after, a year after their release, than those who didn't have that much contact. Those people were six times more likely to return to prison after a year.

There have been a lot of studies that come up with essentially the same finding, and that's why I say that it's the

factor that correlates most strongly with success after release.

Kupers, Tr. 6, pp. 131–32.

Concerning the importance of visitation to prisoners with mental illness and those with parental responsibilities, Kupers stated:

A. . . . people with mental illness probably need more visitation. They probably need their family support more than average, normal people, and of course whenever I make a generalization like that, there are exceptions in every direction, but there are quite a few studies that show whether someone with a mental illness is in a hospital or a correctional facility that they're attaining stability mentally, and their eventual success after they're discharged or released is greatly increased by having meaningful family contact and social support during the time that they're in the hospital or in prison.

Q. Is there a different import of visits that are recognized between prisoners who are parents and the visits with their children, as opposed to other prisoners?

A. Absolutely, and there are differences between men and women. Parents have a very close bond with their children. They feel a great responsibility for raising their children. Women prisoners tend, 80 percent of them have children, 80 percent of those are single mothers, and there is a very, very high incidence of depression in women's prisons, and in most of the literature in correctional psychiatry and in general psychiatry, that is attributed to the separation from their children and loved ones.

Men also, to a lesser extent, slightly, and they're less able to verbalize it, and they're more likely to act out, but men who are fathers also have real difficulties because of the fact that they're separated from their children.

Kupers, Tr. 6, p. 132–33.

Defendants do not challenge Dr. Kupers' testimony about the importance of visitation; indeed, many Department of Corrections witnesses testified that visitation was chosen as the vehicle of punishment precisely because it is important to prisoners, and therefore perceived as a "powerful tool" for prison management.

While emphasizing the positive effect of visitation on a prisoner's mental health, general adjustment, and successful re-entry to society, Dr. Kupers also testified to the devastating impact on the prisoner when visits are eliminated. With respect to the impact to the spousal relationship, Dr. Kupers stated:

Q. Do you have an opinion about what a permanent ban would do on a marital relationship between a prisoner and an outside spouse?

A. Yes, I do. When I described the sibling bond, I said that one thing you know about your sibling, whether you're close or distant, is that you will be together to bury your parents. That's not true of marital bonds or primary relationships, so there is a high rate of separation of prisoners and their spouses during the term of incarceration. There was a study done of this in the '70s, and the author said that, actually, a quarter of prisoners' primary relationship breaks up in the first year or two of incarceration. Now, what's significant about that is how impressive it is that three quarters

don't break up and the spouse continues to visit.

Well, if you put a two-year hiatus or longer in the ability of the spouse to visit, it will have a very detrimental effect on the continuity of those relationships, and probably the rate of separation and divorce will go higher, and that will have ripple effect, negative effects on the children, et cetera.

Q. And what is, if you know, based upon your practice and your review of the literature, the impact on prisoners for the breakup of their marriage during their incarceration?

A. Besides losing contact with their children, that's probably the most destructive relational separation that occurs for a prisoner. There are studies that show that if a prisoner is released and goes to live with a partner, their recidivism rate, on average, goes way down, almost down to 15, 20 percent, as compared to 63 percent which is the standard recidivism rate.

And the conclusion of that study was that a prisoner living alone is going to get into trouble, particularly in that very difficult period right after being released, whereas a prisoner who returns to their family or partner, they are going to do an awful lot better.

Well, that's just one little glimpse of the harm done to the prisoner when a primary relationship breaks up. The prisoner begins to despair, there are all kinds of implications in terms of developing mental illness of various kinds. There is the possibility of not caring and getting into disciplinary trouble. There is the possibility of substance use, et cetera.

Kupers, Tr. 6, 159–61.

Dr. Kupers also emphasized the overwhelming impact of the permanent visita-

tion restriction on prisoners suffering from or prone to mental illness:

Q. Dr. Kupers, could you tell us if there's any different or unique impact of this permanent restriction on those prisoners who are suffering from some form of mental illness?

A. Yes. What I have found in general, and I think the literature supports me on this, is that people enter prison prone to one or another kind of mental illness. For instance, some people are prone to depression, some people are prone to paranoia, some people are prone to disorganization and schizophrenic breakdown.

Now, if those people with that propensity are housed in a secure place, feel safe and able to establish some kind of productive work and close relationships with people, they might not have a mental breakdown. But if they're stressed, severely stressed or traumatized, they're more likely to have a mental breakdown.

So what happens to someone who goes into prison with a propensity to mental break down, and if they went in at a young age, they may not have had a mental breakdown yet, or they may have had a long history [of] mental illness and treatment. If they go in, each stressful condition and each successive trauma makes it more likely that they'll have the kind of breakdown that their psychological makeup makes them prone to.

So in terms of someone with mental illness, it's extremely important for them to be in contact with their loved ones and support system, and when they're not, they're more likely than anyone else to have a mental break-

down of the kind they have a propensity for.

Kupers, Tr. 6, pp. 165–66.

Further, Dr. Kupers testified that a permanent visitor restriction would be counterproductive to substance abuse treatment and would actually tend to increase a prisoner's tendency to resort to drug abuse:

Q. In the consensus of how to treat substance abuse problems, is there any consensus as to whether or not separating substance abuse users from their close family contacts is a positive or a negative thing for the treatment?

A. Yes. In all of the different approaches within that framework I just gave, developing the support network is considered a crucial part of the work, so actually the opposite would occur. Instead of enforcing or even permitting separation, what the drug counselor would tend to do is bring the individual closer to the family.

Kupers, Tr. 6, p. 170.

Q. Do you have an opinion with regard to the use of a permanent ban on all visitation for people who have substance abuse problems, as to how that will affect people who have those problems?

A. Yes, I do.

Q. Could you tell me?

A. It will be counter therapeutic, to the extreme, and that is that the lack of contact with family, particularly if there's a sense that it's unfair, that there's no hope of reversing it, and that there's nothing the individual can do about it, as I said in the previous part of the discussion, will tend to make the person resentful, that will tend to make them act out and not take part in a program, and certainly it will have some ramifications in terms of them resorting to substances.

By the way, they may not resort to substances inside the prison. There's a large percentage of prisoners who have substance problems, as I said, 60 to 80 percent, and there's very few percent, I'd say a couple of percent, of prisoners who use substances inside. Most prisoners with a drug or alcohol problem do not use inside of prison. The problem we're worried about is what happens when they get out. And in the way I just described, the lack of contact with loved ones makes them much more prone to abuse again once they're discharged.

Kupers, Tr. 6, pp. 171–72.

Defendants offered no evidence to contradict Dr. Kupers, and anecdotal support for his opinions was offered by a number of Plaintiffs' witnesses and exhibits, as more fully set forth in the Court's Findings of Fact. Based on the evidence of record, the Court concludes that the permanent restriction on visitation meets the "sufficiently serious" test set forth in *Farmer supra.*[54] This finding applies to the ban whether it is in fact "permanent" or rather reviewable in two years, as sometimes applied. As Dr. Kupers and other witnesses indicated, the uncertainty and inconsistency of application creates additional problems, also sufficiently serious

54. Dr. Kupers also testified that the permanent ban is "cruel" in his professional opinion, because 1) it denies or damages [the prisoner] in terms of a basic human need; 2) the measure taken is excessive for the situation; 3) an average, ordinary person would find it abhorrent or appalling; and 4) the person perpetrating the policy intends to do harm. *See* Tr. 7, pp. 23–24, 30–31.

to meet the *Farmer* test. But the problems with this restriction would not be cured even if there were some way to assume prompt and certain implementation and consistent time limits. A two-year restriction on all visits is sufficiently serious to meet the *Farmer* test. A long-term restriction on all visitation goes to the essence of what it means to be human; it destroys the social, emotional, and physical bonds of parent and child, husband and wife, body and soul. Nothing could be more fundamental.

Furthermore, this restriction has been imposed with a callousness that could serve as the definition of deliberate indifference. Permanent restrictions have been imposed where the extenuating circumstances underlying the substance abuse misconduct include the death of a parent, recovery from cancer surgery, allergic reaction to the drug patch, medical conditions making it difficult to provide urine for a drug test, and serious mental illness.[55] The restriction is often not imposed for months or even years after the second qualifying misconduct. Prisoners are often not told how long the restriction will last, and statements that the restriction will be reviewed within a certain time frame are not followed. Prisoners are not told what they must do to get the restriction lifted, nor why their request for reinstatement has been denied. And although Plaintiffs presented some of the more dramatic and idiosyncratic stories of prisoners affected by the permanent ban, it is the pain and confusion evident in the more ordinary cases that is most compelling: *Brenda Clark*, who cannot see her six and fifteen year old children because of a misconduct based on her inability to urinate for a drug test (notwithstanding being on medication for Chron's Disease, a side-effect of which is difficulty in urinating); *Kim Staton*, who could not see her young son for over two years, despite a state court order requiring her sister to bring him to the prison (warden said sister had to bring him but prison did not have to let him visit); *Merion Johnson*, who has had no visits since April, 1997; *Harrison Bowyer* who has not had visitors since 1999 and is unable to prepare for his parole hearing; *David Brewer*, who had no visitors for over a year before his release from prison and has had an extremely difficult time becoming reacquainted with his two young children. Witness after witness, exhibit after exhibit, all testify to the emotional and psychological devastation wrought by Defendants' policy, and the deliberate indifference with which it is enforced.

The Sixth Circuit has addressed the issue of visitation and held that "[p]rison inmates have no absolute constitutional right to visitation." *Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir.1984) (citations omitted). "Limitations upon visitation may be imposed if they are necessary to meet penological objectives such as the rehabilitation and the maintenance of security and order." *Id.* (citations omitted). This Court concludes that, in the instant matter, the permanent ban is not necessary to meet a penological objective. As stated previously, no evidence was presented to substantiate that the permanent ban has reduced substance abuse or instances of violence within the Department, and substantial evidence was presented to establish that the permanent ban is counterproductive to the prisoners' mental health, stability, potential for future substance abuse, and rehabilitation.

---

**55.** Plaintiffs' Exhibit 40 includes a selection of files from the random 20% sample of the prisoners placed on permanent restriction since 1995. Presumably the remaining files would provide additional examples.

This Court acknowledges that conditions which are harsh and even restrictive are "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392. Under contemporary standards of decency, however, a permanent ban on visitation presents more than just a harsh and restrictive condition. When conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect [inmates] constitutional rights.' *Rhodes,* 452 U.S. at 351, 101 S.Ct. 2392 (citations omitted). Such a case is presented here.

### B. *First Amendment*

■ As discussed above, the First Amendment, applied to the States through the Fourteenth Amendment, protects prisoners' rights of association in the context of visitation. When the State restricts those rights, the Court must apply the *Turner* balancing test to determine the legitimacy of the restriction.

With respect to the permanent ban on visitation imposed after two substance abuse misconducts, it is questionable whether there is a valid rational connection between the permanent ban and the stated penological interest of reducing substance abuse in prisons. Several defense witnesses testified that it was their impression that substance abuse within the system had decreased since 1995, but no statistical evidence was introduced to support this. In addition, Plaintiffs' expert Dr. Kupers testified that the imposition of the permanent ban would be counterproductive to the goal of reducing substance abuse, since it would lead to increased depression, contribute to psychological and emotional instability, and ultimately promote increased dependence on illegal substances. *See* Kupers, Tr. 7, pp. 15–19, 38–39. Dr. Mintzes offered similar expert testimony. *See* Tr. 6, pp. 26–27. Moreover, there was no evidence to suggest that prisoners refrained from substance abuse after the restriction was imposed, and in fact many prisoners were denied reinstatement of visiting privileges because of continued substance abuse misconducts. *See* Pls.' Ex. 40. Thus, there is scant evidence, if any, that the permanent ban is rationally and validly connected to the penological objective of reducing substance abuse; the weight of the evidence establishes that this restriction is counterproductive to its goal.

The second *Turner* factor is whether there are alternative means for the prisoner to exercise the implicated constitutional rights. The restriction at issue is a permanent ban on all visits (other than with an attorney or clergy). As discussed above, letters and telephone calls are not adequate substitutes for visits with family and friends. This factor clearly weighs in favor of Plaintiffs' claims.

The third *Turner* factor is what impact accommodation of the implicated constitutional right would have on the prison administration. Prior to 1995, this sanction did not exist. The overwhelming evidence is that administration of the permanent ban, riddled with uncertainty and inconsistency, has been a nightmare for the MDOC as well as for the prisoners. Revocation of this restriction would have a positive impact on prison administration. To the extent that the Defendants believe they would be losing a "powerful management tool," as testified to by Warden Caruso, there are other sanctions already in place and utilized to punish substance abuse misconducts, including loss of good time and change in security level.

Finally, with respect to the fourth *Turner* factor, the evidence establishes that the permanent ban on visits is an exaggerated response to prison concerns. As set

forth above, drug abuse in Michigan prisons had actually decreased since mandatory drug testing began in the 1980s. *See* VanOchten, Tr. 1, pp. 88–89. Statistical evidence compiled by Plaintiffs showed that drug use by prisoners is not a pervasive problem within the MDOC. *See* Kupers, Tr. 7, pp. 38–39. Former Director McGinnis acknowledged his 1994 testimony (prior to the permanent ban) "that Michigan prisons were well managed, well controlled and had an absence of violence." McGinnis, Tr. 8, p. 52. Further, Defendants' acknowledgment that they do not have enough treatment programs available to handle the prisoners battling substance abuse problems, and the inability of the Department to provide appropriate substance abuse treatment in many instances, shows that the MDOC is using this draconian restriction as a substitute for meaningful treatment which might actually accomplish the long-term goal of reducing drug dependency and recidivism. *See* VanOchten, Tr. 1, pp. 96–97. Thus, all four of the *Turner* factors weigh in favor of Plaintiffs' position that the permanent ban unreasonably burdens their constitutional rights under the First Amendment.

### C. *Fourteenth Amendment*

The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty or property, without due process of law." U.S. CONST. amend. XIV, § 1. It protects "the individual against arbitrary action of government." *Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). A due process claim is examined in two steps. First, the Court must first ask whether the individual possesses a liberty or property interest which has been interfered with by the State. *See Kentucky Dep't. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citing *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Second, the Court must ask "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (citing *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)).

Protected liberty interests may arise from two sources—the Due Process Clause itself or the laws of the States. *Thompson,* 490 U.S. at 460, 109 S.Ct. 1904 (citing *Hewitt,* 459 U.S. at 466, 103 S.Ct. 864). In *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court constructed a new approach for determining whether a prisoner derives a liberty interest from state law. As the Court stated, these interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293 (emphasis added) (citations omitted). To determine what constitutes an "atypical and significant hardship" courts consider 1) the effect of the restraint on the length of prison confinement; 2) the extent to which the prisoner's confinement is altered from routine prison conditions; and, 3) the duration of the restraint. *See Jones v. Baker,* 155 F.3d 810, 814 (6th Cir.1998) (Gilman, J., concurring) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).[56]

---

**56.** Prior to its decision in *Sandin,* the Supreme Court held that inmates do not have a due process right to unfettered visitation. *See Thompson,* 490 U.S. at 460, 109 S.Ct. 1904. In *Thompson,* inmates challenged Kentucky prison regulations that allowed for the sus-

■ With respect to the permanent ban on visitation imposed when a prisoner is found guilty of two substance abuse misconducts, the Court concludes that such a restriction constitutes an atypical and significant hardship on Plaintiffs and thereby deprives them of an interest protected by the Fourteenth Amendment. The first *Sandin* factor is "the effect of disciplinary action on the length of prison confinement." Although there was testimony that the permanent visitation restriction makes it more difficult for prisoners to prepare for parole hearings, thereby potentially lengthening a prisoner's sentence, the length of confinement is not significantly affected by the permanent ban on visitation.

The second factor is "the extent to which the conditions of the restriction differ from other routine prison conditions." As more fully set forth above, the permanent ban on visitation is unique among state prison systems. It contradicts ACA standards; it differs sharply from past practice within the MDOC; and it creates an unusually harsh and punitive environment for the prisoners restricted.

The third factor is "the duration of the restriction imposed compared to discretionary confinement." The restriction at issue is permanent. Although the regulations provide for the possibility of review after two years, there are many instances where no such review occurs, or where reinstatement of privileges after two years is denied. As of the date of trial, over half of the restricted prisoners had been on the permanent ban for more than twenty-seven months; a significant number had been restricted for over three and a half years. The extent to which the permanent restriction differs from other routine prison conditions, and the duration of the restriction at issue here, weigh heavily in favor of Plaintiffs' claim that Defendants' policy violates the Fourteenth Amendment. The inconsistency and uncertainty of enforcement, the absence of any criteria for reinstatement, and the failure to provide any opportunity to be heard are all procedural deprivations of constitutional dimension. The permanent ban on visitation is indeed an "atypical and significant hardship," apparently imposed for that very reason. In imposing this restriction, Defendants have violated Plaintiffs' rights under the Fourteenth Amendment.

## CONCLUSION

The evidence presented in this case provides an intimate look at the psychological, emotional, and physical constraints of incarceration. Visits from family and friends are one of the slender reeds sustaining prisoners during their confinement; prisoners and prison administrators rely

pension of inmates' visitation with certain types of visitors. *See id.* The *Thompson* Court found no interest in unfettered visitation which derives directly from the Due Process Clause and, applying the methodology it set out in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), held that the State regulations had not otherwise created such an interest. *See id.* Neither *Thompson* nor the cases which followed it, however, addressed a ban on visitation similar to Michigan's permanent ban imposed on prisoners who have been found guilty of two substance abuse misconducts. And in his concurring

opinion in *Thompson,* Justice Kennedy specifically noted that the Court's opinion did not foreclose a Due Process challenge to a prison regulation permanently forbidding all visits to some or all prisoners. *See Thompson,* 490 U.S. at 465, 109 S.Ct. 1904 (Kennedy, J., concurring); *see also Loomis v. Rentie,* No. 94–35820, 1995 WL 453140, at *1 (9th Cir. July 31, 1995) (reversing grant of summary judgment against prisoner where record insufficient to determine if denial of all visitation for an extended period deprived prisoner of liberty interest under the Due Process Clause).

upon the stabilizing and rehabilitative effects promoted by supportive visits.

For all the reasons stated above, the visitation restrictions challenged by Plaintiffs violate the constitutional rights of Michigan's prisoners. Even under the most deferential review, these restrictions are not reasonably related to legitimate penological interests. The Court finds in favor of Plaintiffs on all claims.